# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-1513

FLOYD RICHARDSON,

*Petitioner-Appellee,*

v.

KENNETH R. BRILEY,

*Respondent-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 6425—**Matthew F. Kennelly**, *Judge.*

———————

ARGUED NOVEMBER 4, 2004—DECIDED MARCH 18, 2005

———————

Before BAUER, RIPPLE, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Floyd Richardson was convicted by
an Illinois state court jury for the armed robbery of Twin
Foods and Liquors and the murder of store clerk George
Vrabel. In 1984, he was sentenced to death for these
crimes.[1] Since that time, he unsuccessfully worked his way
through the appeal and post-conviction review process in

———————

[1] Richardson's death sentence was commuted on January 11,
2003, to a sentence of life without possibility of parole. Then-
Governor George Ryan commuted the death sentences of all pris-
oners who were on death row in Illinois on that date.

Illinois. He then filed a habeas corpus petition in federal district court and an evidentiary hearing was held in August 2002. The district court granted Richardson's petition for a writ of habeas corpus, finding that his conviction was tainted by intentional deception on the part of the prosecution. We, however, find that Richardson did not meet his burden of proving prejudice and, therefore, we reverse the decision of the district court and vacate the grant of the writ.

## I. History

Twin Foods and Liquors is a convenience store located in Chicago. On April 1, 1980, at about 10:00 P.M., the store was robbed and a clerk, George Vrabel, was fatally shot. In the early morning of April 5, 1980, a tavern one mile away was also robbed and its owner was shot and wounded. Ballistics evidence linked the two crimes.

Richardson was arrested on May 4, 1982, as a suspect in an unrelated robbery. At that time, detectives reopened the investigation into Vrabel's murder. Detectives John Solecki and Joseph DiGiacomo put together a photo lineup which included Richardson's photo and showed it to witnesses of the two 1980 robberies. Several of the witnesses identified Richardson, and he was charged with murder.

### A. Testimony at Trial

Ballistics evidence proved that the same gun was used in both the Twin Foods robbery and the tavern robbery. Ernest Warner, a Chicago Police Department firearms examiner, testified that he had examined bullets that were recovered from the Twin Foods location and from the tavern. He explained that in order to determine whether two different bullets were fired from the same gun, he uses class characteristics common to all guns produced by the same

manufacturer and individual characteristics unique to each gun. He concluded that the same gun fired the bullets recovered from the sites of both robberies. The murder weapon, however, was never recovered.

### 1. Witnesses of the Twin Foods Robbery

Shirley Bowden was working as a cashier at Twin Foods and Liquors the night of the robbery. At about 10:00 P.M., she noticed a man standing near the liquor department who was "huddled up" in his coat even though it was not especially cold that night. The man walked to the liquor department and passed within four feet of Bowden. A few minutes later, Bowden heard a gunshot and the warning, "Stay down mother fucker. This is a stickup. Stay down." Bowden looked toward the liquor department and saw the man she had noticed earlier reaching over the counter and taking money from the register. After she heard a second shot, the robber ran through the store and out the front door, passing Bowden as he did so. Bowden ducked behind the counter when she saw him coming toward her but stood up after he exited to verify which direction he was running. Bowden called the police and then went to the liquor department to find Vrabel lying on the floor and bleeding.

At trial, Bowden identified Floyd Richardson as the man whom she saw commit the robbery and murder. She also testified that she had seen Richardson in the neighborhood prior to April 1. She had not viewed a lineup or photo array before trial.

Bonnie Williams was also working at Twin Foods on the night of the robbery. Williams testified that she ducked behind a counter when told that a robbery was occurring. When she heard the first shot, she stood up and looked toward the liquor department in time to see a man reaching behind the counter and taking money out of the register.

The man ran out of the store past Williams and Bowden. Williams was able to see "his whole face" when it was "just a few feet" away.

Williams identified Richardson in open court and testified that she had selected his photograph from both black and white and color photo arrays that police officers had shown her in 1982. She said she had seen Richardson once before the robbery, but that she did not know him personally.

### 2. Witnesses of the Tavern Robbery

Thomas Fitzpatrick testified about the April 5 robbery which took place at his tavern about one mile from Twin Foods. At approximately 1:30 A.M., he was standing at the cash register of his tavern when a man entered waving a gun. The man said "this is a stickup" and jumped over the bar. Fitzpatrick tried to run away from the man and was shot in the back. He stated that he crawled to a hallway and lay on the floor face up. The assailant approached and stood over Fitzpatrick and demanded to know where the rest of the money was located. When Fitzpatrick said there was no more money, the robber left the store. Fitzpatrick testified that there was a fluorescent light right above him as he spoke to the robber and that "you could see very well." He also claimed that he was fully conscious during the encounter, even though he had been shot.

In May 1982, Fitzpatrick tentatively identified Richardson as the gunman after viewing both black and white and color photographs. He viewed a lineup on October 5, 1982, and again identified Richardson as the man who shot him. At trial, he testified, "I'm just positive when I identified him in the lineup that that was the man that came after me and shot me." He further testified, "When I saw Floyd Richardson in the lineup, I knew it was him, positively. There was no doubt in my mind." Fitzpatrick also identified Richardson in court.

Ray Slagle was a patron in Fitzpatrick's tavern on the night of the robbery. When he heard shots, he stepped behind a partition and "watched everything that happened" from a distance of about ten feet. He saw a man reaching into the cash register. Slagle looked around the partition three or four times to observe the robber's actions. Slagle threw a chair at the robber as he ran toward the exit. Like Fitzpatrick, Slagle testified that the tavern was well lit.

Slagle also testified that he picked Richardson's photograph out of a police photo array and later identified him in a lineup. He identified Richardson as the robber at trial.

### 3. Defense Witnesses

The defense called Detective John Solecki, who testified that he had interviewed witnesses to the Vrabel shooting and then sent a flash message from the scene describing the suspect as having a "full, trimmed beard." He did not identify who had given him that description.

After examining Solecki, Richardson's attorney advised the trial judge that it was "possible" that he intended to call another witness. The judge then called a short recess. When trial resumed, the following colloquy took place between Mr. Lazzaro, one of the assistant state's attorneys prosecuting the case, and Mr. Babb, one of the assistant public defenders representing Richardson:

> Mr. Lazzaro: Your Honor, I just want to raise, on the record, that which has occurred in the last 20 or 25 minutes or so. Listed in a supplemental answer to discovery, which we gave to Counsel, was a name of a Floyd Butler that actually is Lloyd Butler. It's a typographical error and his real name is, in fact, a Leonard Butler. He just goes by the name of Lloyd. I have informed

Counsel as to certain statements that Mr. Butler will give in rebuttal, if Myron Moses is called.

He would deny telling Mr. Butler that shortly, within a matter of hours after the incident, that the person coming out the door was, in fact, Floyd Richardson, and I've informed Counsel that is the rebuttal testimony that I expect as to Mr. Butler. I have informed him that Mr. Butler is, in fact, employed by the Rosemont Police Department and they can contact him there, if they have any questions.

I just want the record to show I'm, in fact, giving them that information if, in fact, Myron Moses is called as a witness. Is that correct, Counsel?

Mr. Babb: Except, we don't intend to put him on to deny anything. We intend to put him on for the purpose of saying he knew Floyd Richardson and that was not Floyd Richardson that came out of there with a gun.

The Court: At which point, the cross examination—

Mr. Lazzaro: Would be as to what he spoke to Mr. Butler, and I want the record to reflect that is the information that has been given to me by Mr. Butler.

Mr. Babb: And also, to be fair, Mr. Moses has been confronted with that, in our presence, and he denies that he said that to Mr. Butler, who is a brother of his girlfriend.

Mr. Lazzaro: This is in the nature of further discovery. The believability, the voracity [sic] is for the jury.

| The Court: | It's for somebody other than those of us who are in the room. |
| Mr. Babb: | We are simply not going to put him on today. We want to talk to Mr. Butler. |
| The Court: | What do you want me to do as far as this jury is concerned? |
| Mr. Babb: | Send them home. |

(Trial Tr. at 631-33). The trial judge then recessed the trial for the rest of the day.

The next day, the defense called Richardson's mother. She testified that Richardson never had a full beard, only a mustache and a goatee. The defense then rested. The record does not reflect any further discussion about Myron Moses or Leonard Butler.

### 4. Sentencing

The jury found Richardson guilty of murder and armed robbery. Richardson waived his right to a jury at sentencing. In aggravation, the prosecution offered evidence of two previous armed robbery convictions and convictions for felony theft, possession of a controlled substance, and unlawful use of a weapon. Richardson had been arrested in seven other instances, though the charges were dismissed, and had struck a correctional officer while incarcerated. The prosecution also offered evidence relating to the May 4, 1982, attempted robbery which led to Richardson's arrest.

As mitigation testimony, Richardson's mother and common law wife were called. His mother explained that Richardson had helped to take care of his brothers and sisters after his father died. His wife testified that Richardson loved her and that he tried to make a better life for her and their two children. Richardson took the stand and denied shooting either Vrabel or Fitzpatrick.

The trial judge sentenced Richardson to death and the conviction and sentence were affirmed by the Illinois Supreme Court on direct appeal in 1988. *People v. Richardson*, 528 N.E.2d 612 (Ill. 1988) (*Richardson I*). The United States Supreme Court denied certiorari in March 1989. *Richardson v. Illinois*, 489 U.S. 1100 (1989) (*Richardson II*).

### B.  Post-Conviction Proceedings

In January 1991, Richardson filed a petition for relief under the Illinois Post-Conviction Hearing Act. 725 Ill. Comp. Stat. 5/122-1. Richardson argued that his trial counsel were ineffective because they did not object to the dismissal of prospective jurors who were black, they did not call Myron Moses to testify, and they did not present significant mitigation evidence at the sentencing hearing. Richardson also found fault with his appellate counsel. Finally, he argued that the prosecution had violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by removing jurors solely on the basis of race. The petition was dismissed in 1997. Richardson appealed to the Illinois Supreme Court and the lower court's ruling was affirmed. *People v. Richardson*, 727 N.E.2d 362 (Ill. 2000) (*Richardson III*). The United States Supreme Court again denied certiorari. *Richardson v. Illinois*, 531 U.S. 871 (2000) (*Richardson IV*).

### C.  Federal Habeas Corpus Petition

Richardson filed a petition for a writ of habeas corpus in February 2001. 28 U.S.C. § 2254. He argued that his due process rights were violated in several different ways. Most relevant to this appeal, he alleged that Assistant State's Attorney Lazzaro committed prosecutorial misconduct when he falsely informed Richardson's counsel that Leonard Butler would impeach the testimony of Myron Moses.

Richardson supported this claim with several affidavits. Moses stated that he knew Richardson, that he had seen the Twin Foods robber flee the store, and that the robber was not Richardson. Butler stated that he had never gone by the names Lloyd or Floyd, Moses had not told him that Richardson was the man Moses saw running from the store, and Butler had never told the prosecutors or the police that Moses had said any such thing. Richardson stated that he told his counsel that they should call Moses in spite of the potential impeaching testimony, but that they had explained to Richardson that it would "look bad" if a police officer testified in rebuttal. Richardson then agreed that Moses should not be called. Richardson's trial counsel submitted affidavits stating that they did not remember why they had not called Moses to testify, whether they had spoken to Moses, or whether they had interviewed Butler.

The state argues that Richardson's prosecutorial misconduct claim was procedurally defaulted because it was not raised in state court. However, over an objection from the state, the district court held an evidentiary hearing on the claims of prosecutorial misconduct and ineffective assistance of counsel. Citing *Thomas v. McCaughtry*, 201 F.3d 995, 999 (7th Cir. 2000), the court agreed that the prosecutorial misconduct claim had not been raised in state court but held that the procedural default could be excused if Richardson could show cause and prejudice for his failure to raise the claim.

The district court found that Richardson did show cause and prejudice because the prosecutor's misrepresentation impeded Richardson's ability to raise the claim in state court. The state acknowledges that the district court's credibility and demeanor evidence is difficult to challenge; therefore, the "cause" determination is not contested. Instead the state argues that Richardson did not meet his burden of proving prejudice. For the reasons set forth below, we agree that Richardson was not prejudiced by the prosecutor's statement.

## II.  Analysis

Richardson's habeas petition is governed by 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). In a habeas appeal, this court reviews the district court's findings of fact for clear error. Legal conclusions and mixed questions of law and fact are reviewed *de novo. See, e.g., Foster v. Schomig*, 223 F.3d 626, 634 n.4 (7th Cir. 2000); *Warren v. Richland County Circuit Court*, 223 F.3d 454 (7th Cir. 2000).

The purpose of the AEDPA is to advance the doctrines of comity, finality, and federalism. *See Williams v. Taylor*, 529 U.S. 420, 436 (2000). It is an attempt to "limit the scope of federal intrusion into state criminal adjudications and to safeguard the States' interest in the integrity of their criminal and collateral proceedings." *Id.* at 436.

### A.  Evidentiary Hearing

Section 2254(e)(2) controls whether Richardson should have received an evidentiary hearing on his claim in the district court. The statute reads as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for

constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

§ 2254(e)(2). It is undisputed that Richardson did not fully develop the factual basis of his prosecutorial misconduct claim in state court. However, "[u]nder the opening clause of § 2254(e)(2), a *failure* to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432 (emphasis added).

The district court found that there was no lack of diligence on the part of Richardson's counsel; "rather[,] their further inquiry regarding the Myron Moses/Leonard Butler matter was effectively thwarted by their reasonable reliance on the veracity of the prosecutor's misrepresentations at trial." *Richardson v. Briley*, No. 00 C 6425, 2004 WL 419902, at *10 (N.D. Ill. Feb. 10, 2004) (*Richardson V*). We have stated that a petitioner should not be penalized "for presenting an issue to us that he was unable to present to the state courts because of the state's misconduct." *Crivens v. Roth*, 172 F.3d 991, 995 (7th Cir. 1999). If the failure to develop the factual basis of the prosecutorial misconduct claim should not be attributed to Richardson, he does not have to meet the strict standards for the granting of an evidentiary hearing found in § 2254(e)(2)(A) and (B). *See Davis v. Lambert*, 388 F.3d 1052, 1060 (7th Cir. 2004). However, if that section does not apply, "it is then necessary to evaluate the request for an evidentiary hearing under pre-AEDPA standards." *Id.* at 1061 (quoting *Matheney v. Anderson*, 253 F.3d 1025, 1039 (7th Cir. 2001)). "Under pre-AEDPA standards, a federal evidentiary hearing is required if (1) a habeas petitioner alleges facts which, if proved, would entitle him to relief and (2) the state courts—for reasons beyond the control of the petitioner—never considered the claim in a full and fair hearing." *Matheney*, 253

F.3d at 1039. *See also Davis*, 388 F.3d at 1061; *Hampton v. Leibach*, 347 F.3d 219, 244 (7th Cir. 2003).

The district court did not consider Richardson's request for an evidentiary hearing within the constraints set forth by *Matheney*. We will undertake that analysis now. It is clear that the state courts did not conduct a hearing on Richardson's prosecutorial misconduct claim, so we must consider whether Richardson alleged facts that, if proved, would entitle him to relief. He alleged that Butler would not have testified that he heard Moses say that Richardson was the man who had run out of Twin Foods. If true, that fact could prove that the prosecutor misrepresented Butler's potentially impeaching testimony.[2] This information is essential to Richardson's ineffective assistance claim as well because that claim is based on his trial counsel's failure to interview Butler. In order to consider whether Richardson was prejudiced by Lazzaro's statement, the record needed to be expanded so that the effect of Moses's testimony could be considered. *See Hampton*, 347 F.3d at 235; *Matheney*, 253 F.3d at 1039. Therefore, the evidentiary hearing was properly granted.

## B. Procedural Default

When a petitioner does not adequately present a claim to the state courts, he "may obtain federal habeas relief only

---

[2] It is important to note that prosecutorial misconduct is not an independent basis for habeas relief. The Supreme Court has made clear that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The Court also noted that even when the misconduct was "egregious," such as knowing use of perjury, it is only the "misconduct's effect on the trial, not the blameworthiness of the prosecutor" that will give rise to a due process violation. *Id.* at 220 n.10.

upon a showing of cause and prejudice for the default or upon a showing that a failure to grant him relief would work a fundamental miscarriage of justice." *Moore v. Casperson*, 345 F.3d 474, 484 (7th Cir. 2003). In order to show prejudice, Richardson must prove that any errors worked to his "*actual* and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). A fundamental miscarriage of justice occurs when a petitioner can prove that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

The district court found that Richardson had satisfied the cause element by showing that "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." *Richardson V*, 2004 WL 419902, at *15 (quoting *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (citations omitted)). As noted earlier, the state has conceded that it would be "difficult to challenge the district court's credibility and demeanor determinations" and therefore does not appeal as to that issue.

We must decide, then, whether Richardson has proven that Lazzaro's statement about Butler's potential testimony prejudiced him. Richardson "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 465 U.S. at 170 (emphasis in original).

Richardson must therefore convince the court that "there is a reasonable probability that the result of the trial would have been different" if Moses had testified. *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (internal quotations omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair

trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 289-90 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Put another way, we must decide whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 290 (quoting *Kyles*, 514 U.S. at 435).

The district court found that "Richardson had a highly credible exculpatory witness ready to take the stand" and that "there is a reasonable probability that Richardson would have been acquitted if he had not effectively been tricked into deciding not to call Moses." *Richardson V*, 2004 WL 419902, at *16, *17. The court based this determination on an assessment of the reliability of the state's witnesses as compared to Moses's reliability. The court found that the state's witness testimony "was subject to a significant possibility of error based on the usual factors that can make eyewitness identification testimony unreliable—the lack of a significant opportunity to see the perpetrator, focus on factors other than the perpetrator's face (i.e., the gun), and so on." *Id.* at *17. The court also found that Moses "had a much better opportunity to see the offender than did the witnesses who had been inside the store[.]" *Id.*

Section 2254(e)(1) makes clear that in a habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." The Supreme Court of Illinois made several factual determinations about the credibility of the witnesses that were not given adequate weight by the district court. The state court found that all of the witnesses "had an excellent opportunity to observe defendant and were able to recount in detail what he said and did." *Richardson I*, 528 N.E.2d at 623. When assessing the witnesses individually, the state court found that as the robber ran towards Williams, her "attention remained

focused on the robbery and the robber"; Fitzpatrick "had an excellent opportunity to view his assailant"; and "Slagle's attention was clearly focused on the gunman . . . ." *Id.* These determinations of fact by the state court are entitled to a presumption of correctness. Richardson did not provide clear and convincing evidence that the witnesses were not credible.

Giving appropriate recognition to the dictates of § 2254(e)(1), we have the testimony of four credible witnesses who gave sworn testimony before the jury that Richardson was the man they had seen commit the robberies. On the other hand, we have the testimony of Myron Moses. The district court was "convinced of the credibility of [Moses's] testimony that he got a good look at the fleeing offender and that the man was not Floyd Richardson." *Richardson V*, 2004 WL 419902, at *11. The court also found that Moses was "a completely disinterested person in both the underlying prosecution and the present case, [who] likewise has no reason or motive to have lied in his testimony before this court." *Id.*

We agree that there is no apparent reason that Moses would have lied to the court. However, it is possible that he was simply wrong. Moses was about twenty-five feet away, across the street from Twin Foods, when the robber ran out of the store. It was nighttime—10:00 P.M. Annette Butler, who was with Moses at the time of the robbery, testified in district court that she and Moses had run away from Twin Foods when they heard the shot. Contrary to Moses's assertion that he was unable to pick anyone out of the police lineup, a police detective testified that Moses did make a tentative identification of Richardson in a lineup in 1982. Considering Moses's testimony in the larger context of the trial, it would not be unreasonable to conclude that a jury could have discounted his credibility.

The testimony that Moses planned to offer is not enough to "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Although it may be true that there is a reasonable *possibility* that Moses's testimony would have produced a different result, that is not the standard Richardson must meet here. Richardson's "burden is to establish a reasonable *probability* of a different result." *Strickler*, 527 U.S. at 291 (emphasis in original). We find that there is not a "reasonable probability" that the jury would have found Moses's testimony so compelling that the testimony of the four other witnesses would have been completely discounted and Richardson would have been acquitted. Therefore, Richardson did not prove that he was prejudiced by the prosecutor's statement at trial.

### C. Ineffective Assistance

The district court did not reach the merits of Richardson's ineffective assistance claim. Because neither party raised this issue on appeal, we need not discuss it here. We do note, however, that the lack of prejudice discussed previously would preclude the claim under *Strickland v. Washington*, 446 U.S. 668 (1984) (requiring a defendant who claims that his counsel was ineffective to prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

## III. Conclusion

Richardson has not proved that he was prejudiced by the prosecutor's statement regarding the possible impeachment of a defense witness, or by his counsel's failure to interview the witness during trial. Therefore, we REVERSE the decision of the district court and VACATE the grant of the habeas corpus writ. Relief under § 2254 is DENIED.

RIPPLE, *Circuit Judge*, concurring in part and dissenting in part. I agree with my colleagues that the district court did not heed AEDPA's command that we afford a presumption of correctness to the findings of the state court. Failure to adhere to AEDPA's command in this respect constitutes an error of law and requires reversal of the judgment.

My colleagues go on, however, to evaluate de novo the evidence of record and to determine that the petitioner has not shown that the evidence favorable to him establishes a reasonable probability of a different result. In my view, this evaluation belongs, in the first instance, to the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*