In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-2634

CLEVELAND C. BYNUM,

*Petitioner-Appellant,*

*v.*

BRUCE LEMMON,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:05-CV-374—**Philip P. Simon**, *Judge.*

ARGUED FEBRUARY 25, 2008—DECIDED MARCH 27, 2009

Before ROVNER, WOOD, and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge*. A Lake County, Indiana court convicted Cleveland Bynum of murdering five people and sentenced him to 300 years' imprisonment. Bynum filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, contending that his trial counsel was ineffective in failing to put him on the stand at the hearing on his motion to suppress his post-arrest confessions to the murders. Bynum contends that his confession was coerced and that, had he testified about the coercion, the

trial court would have granted his motion to suppress. The district court denied Bynum's petition and, because he has not shown that he was prejudiced by his counsel's ineffectiveness, we affirm.

## I.

On February 16, 2000, Bynum began arguing with his friend Anthony Jeffers. Bynum was upset because Jeffers had told people that Bynum was a drug dealer. A third person, Elizabeth Daily-Ayres, witnessed the confrontation. Later, in the early hours of February 17, Bynum resumed the argument, this time at Jeffers's home. Jeffers's girlfriend, Angie Wallace, was present during this second argument along with Wallace's 18-month-old daughter, her sister Susan, and Susan's thirteen-year-old son, "L.B." That night, L.B., sleeping in a different room, was awakened by five gunshots. L.B. testified at trial that, immediately following the first few shots and while he was still in the bedroom, he heard two men talking. He testified that one voice was Bynum's, even though he had met Bynum only once before. According to L.B., Bynum said "something about putting another shell in." L.B. stated that the other man, whose voice he did not recognize, said "[D]on't rush me," and Bynum responded "[S]hoot her in the head." After Bynum and the second man departed, L.B. left the bedroom and discovered that Jeffers, Angie Wallace, and Susan Wallace were all dead. The 18-month-old child was spattered with blood, but she was still alive.

On that same evening in a different house, Elizabeth Daily-Ayres, Sheila Bartee, and Michelle Fliris were

preparing for bed. According to Fliris, Daily-Ayres paged someone and received a phone call a few moments later. She then decided to go to the liquor store along with Bartee. Fliris went to sleep, but awoke several hours later to find that Daily-Ayres and Bartee had never returned from the store. Fliris noticed a piece of paper Daily-Ayres had left by the phone; on it was written the name "Chris" as well as a phone number. (Bynum, whose middle name is "Christopher," often goes by the nickname "Chris.") The next day, police found Daily-Ayres's and Bartee's bodies lying on the ground in a baseball park, riddled with gunshot wounds.

On February 18, officers arrested Bynum and held him for two days on a probation violation. During that time, Bynum made two statements to police. In his first statement, made on the day of his arrest, he admitted killing Jeffers and the Wallace sisters. He also admitted that he knew Daily-Ayres and had given her his pager number, but insisted that he had not shot her or Bartee. Instead, he reported that Daily-Ayres and Bartee were present at Jeffers's home when he shot the other three victims, but that they left accompanied by two men, Deandre MacIntosh and Terrell Jackson. Bynum acknowledged that he knew MacIntosh and Jackson intended to kill Daily-Ayres and Bartee, but claimed that he had nothing to do with those murders. According to the arresting officers, they read Bynum his Miranda rights before he gave his statement. Bynum also signed a waiver form in which he acknowledged that he was advised of his constitutional rights, including his right to counsel, and that nonetheless he waived those rights. He also

acknowledged in writing that his statement was voluntary and that no one had threatened him.

Two days later Bynum signed a second, identical written waiver and made a second statement. He confirmed that he had killed Jeffers and the Wallaces. This time, however, he exonerated MacIntosh and Jackson, instead claiming that Jeffers shot Daily-Ayres and Bartee before Bynum killed him. He knew this, he said, because he witnessed the murders and because Jeffers used Bynum's gun. Then, Bynum continued, Jeffers forced him at gunpoint to drag the bodies to the baseball park where they were found. Bynum explained that he had walked back to Jeffers's house with Jeffers. Jeffers gave the gun back to Bynum, but when they got into an argument and began pushing each other, the gun accidentally went off, hitting Jeffers. Angie and Susan Wallace began to yell and approached Bynum, who interpreted their conduct as a threat and shot them both. Then, Bynum claimed, he went home and, the next morning, threw his gun in a lake.

Before trial, Bynum met with his appointed counsel, Charles Graddick. According to Bynum's testimony at his post-conviction hearing, he told Graddick that during his interrogation, police threatened him with violence when he asked for a lawyer. Bynum also reported that the officers had handcuffed him to a chair for nine hours, deprived him of food and water, and refused to let him use the bathroom. Byum further claimed that Officer Louis Donald told him that the police had Bynum's fiancée in custody and would charge her with obstruction of justice and harboring a fugitive, events

that would require that their son enter child protective services. It was only after seeing his fiancée at the police station, Bynum continued, that he agreed to sign the waiver form and make his first statement. Finally, Bynum claimed that Donald fabricated the second confession.

Graddick did not respond to these concerns immediately, but at trial, he moved to suppress Bynum's confessions on the theory that they were coerced. Graddick did not ask Bynum to testify at the mid-trial suppression hearing, instead questioning only the three officers who took Bynum's statements. The officers testified that Bynum never asked for counsel, never told them he was tired or hungry, and at no point during the interrogation seemed unwilling to talk to them. The officers also denied physically threatening Bynum or coercing him in any way, although they acknowledged that Bynum seemed nervous and was worried about his family. Moreover, the State of Indiana introduced into evidence the two waiver forms.

After the officers testified and counsel presented argument, the trial court judge ruled that Bynum's confessions were voluntary and denied the motion to suppress. The judge explained that he found the officers' testimony credible, noting that "the police in no way interfered with the voluntariness of the confession" and that "the defendant was properly Mirandized and apprised him of his rights, and he was given an opportunity to bring in an attorney if he desired to do so." After the remainder of the trial, a jury convicted Bynum of five counts of murder, largely based on the confessions.

Bynum challenged his conviction on direct appeal to no avail. He then sought postconviction relief in state court with new counsel, arguing that his trial lawyer was ineffective in failing to put him on the stand to testify at the suppression hearing. At an evidentiary hearing, Graddick testified that he did not recall Bynum ever telling him that he had been prevented from obtaining a lawyer, and maintained that if Bynum had told him about that, he would have moved to suppress the statements before trial. Moreover, Graddick explained that he decided to move to suppress the confessions during trial rather than before because he did not want to give the state advance notice of his trial strategy. And Graddick stated that, in his view, the best way to show coercion was to get the officers to tell inconsistent stories about the interrogation. Finally, he described his fears that, if put on the stand, Bynum's version of events would not withstand cross-examination:

> Counsel:  Why was it that if you did in fact have a suppression hearing, you would not have had Mr. Bynum testify in that portion of the trial?
>
> Graddick:  I was afraid for Mr. Bynum because I had had many discussions with Mr. Bynum, and each time I'd have an at-length discussion with Mr. Bynum, I became more and more sure that once he took the stand, that he couldn't hold up.
>
> Counsel:  All right. And what was it that he told you about what had occurred at the police

> station that would have led you to believe that he could not hold up with respect to—

Graddick: Well, in part his version of what had taken place, and when I would ask him questions about it, I was always able to pick holes in what he was saying and make it not believable.

Therefore, Graddick continued, he concluded it would not be in Bynum's best interest to testify.

A Lake County, Indiana court denied Bynum postconviction relief. The court noted that Graddick made "tactical choices to raise the issues that he believed had merit and to raise them in the way he thought was in the best interest of his client." Because Graddick was skeptical that Bynum's version of events was true, the court continued, he reasonably attempted to suppress the confessions using police testimony alone. Finally, the court concluded that Graddick's strategic decisions did not fall below prevailing professional norms and did not prejudice Bynum.

Bynum sought review in the Indiana Court of Appeals, arguing that the Lake County court erred in concluding that Graddick's performance was constitutionally adequate. The Court of Appeals disagreed. First, addressing whether Graddick's representation was deficient, the court observed that, at the suppression hearing, Graddick successfully established through questioning the police officers that Bynum told the officers he was afraid for his fiancee's safety. Even after the trial court denied the motion to suppress, noted the Court of Appeals,

Graddick sought to undermine the officers' credibility by questioning them about Bynum's allegations that they threatened him and his family. This aggressive questioning led the Court of Appeals to conclude that Graddick's performance was not deficient. The court reasoned: "Mere disagreement with trial counsel's handling of his defense does not make an ineffective assistance claim."

Moreover, continued the court, even if Graddick had called Bynum to testify, Bynum would not have been able to show that he had been prejudiced because the trial court still could have reasonably denied the motion to suppress. Assuming that Bynum's testimony had been offered at the suppression hearing, the court explained, the trial court would still have weighed that testimony against the officers' statements as well as the waiver forms Bynum had signed. The court concluded that, because Bynum had failed to substantiate his account of events, the trial court could not have been expected to credit his claims in light of other contrary evidence. The Court of Appeals therefore affirmed the denial of relief and the Indiana Supreme Court declined to hear the case.

Bynum next turned to federal court, renewing his argument that Graddick was ineffective in failing to put Bynum on the stand and also advancing a new theory: that Graddick had failed to adequately review the state's discovery, his own notes, and Bynum's letter to him before trial, and additionally had failed to spend enough time discussing the case with Bynum, his family, and witnesses. The district court rejected the latter claim as

procedurally defaulted because Bynum had not exhausted his state court remedies. And the court concluded that the former claim fared no better. Even though the court concluded that Graddick was clearly ineffective—Bynum's testimony was the only evidence of coercion there was, and his testimony at the suppression hearing, outside the presence of the jury, would not have damaged his case—the court reasoned that Bynum could not show that he was prejudiced by Graddick's ineffectiveness. The court therefore concluded that the state appellate court's ruling on the question of prejudice was not an unreasonable application of clearly established law and denied Bynum's petition for collateral relief. The court also granted a certificate of appealability limited to whether Graddick was ineffective in failing to have Bynum testify at the suppression hearing.

## II.

Bynum's appeal challenges the state appellate court's conclusions as to both prongs of his claim that his trial counsel was ineffective. He argues that the Indiana Court of Appeals erred in concluding that Graddick's performance was objectively reasonable. And he contends that both the state appellate court and the district court should have concluded that he was prejudiced by Graddick's ineffectiveness. Our review of the district court's decision is de novo. *See Julian v. Bartley,* 495 F.3d 487, 491 (7th Cir. 2007).

We begin with limitations on the scope of our review. We may grant collateral relief from Bynum's state-court

conviction only if the state courts' adjudication of his ineffectiveness claim resulted in a decision that was either contrary to, or involved an unreasonable application of, federal law as determined by the Supreme Court of the United States, or if the state courts' decision was based on an unreasonable determination of the facts given the evidence before the state courts. 28 U.S.C. § 2254(d); *Barrow v. Uchtman,* 398 F.3d 597, 603 (7th Cir. 2005). A state-court decision is contrary to clearly established law if it applies a legal standard inconsistent with governing Supreme Court precedent or contradicts the Supreme Court's treatment of a materially identical set of facts. *Bell v. Cone,* 535 U.S. 685, 694 (2002) (citations omitted); *Goodman v. Bertrand,* 467 F.3d 1022, 1026 (7th Cir. 2006). A state court unreasonably applies Supreme Court precedent if the state court identifies the correct legal rule but applies it in a way that is objectively unreasonable. *Yarborough v. Gentry,* 540 U.S. 1, 5 (2003); *Gilbert v. Merchant,* 488 F.3d 780, 790 (7th Cir. 2007). Our mere disagreement with a state court's analysis is, however, not enough to meet this standard. *Jackson v. Frank,* 348 F.3d 658, 662 (7th Cir. 2003). Rather, the state court's analysis is reasonable so long as it stays within the "boundaries of permissible differences of opinion." *Id.*

Bynum believes that he is entitled to collateral relief because his trial counsel did not competently represent him, thereby depriving him of the right to effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments. *See Gideon v. Wainright,* 372 U.S. 335 (1963); *Jackson v. Miller,* 260 F.3d 769, 775 (7th Cir. 2001). A convicted defendant challenging counsel's effectiveness

must satisfy both prongs of the well-known *Strickland* test: he must show that his attorney's representation was objectively deficient, and he must show that he was prejudiced by the substandard performance. *Strickland v. Washington,* 466 U.S. 668, 687-96 (1984); *Allen v. Chandler,* 555 F.3d 596, 600 (7th Cir. 2009). Bynum argues that his trial counsel, Graddick, was objectively deficient in failing to have him testify at the suppression hearing, and that had he testified, his confessions would have been suppressed, leaving the state with insufficient evidence to support his conviction.

Turning to the first prong of the *Strickland* test, we agree with Bynum that the Indiana Court of Appeals unreasonably concluded that Graddick's decision to keep him from testifying fell within the range of competent legal representation. Bynum's confessions were the crux of the case against him. The suppression motion was therefore critical to the defense: without the confessions, the prosecution would have been left to depend on the testimony of a thirteen-year-old boy who, after meeting Bynum only once, merely heard a voice from another room that he thought was Bynum's. Moreover, Bynum's account of the officers' coercive conduct during his interrogation was the only available evidence of coercion. True, Graddick testified at the post-conviction hearing that he intended to elicit evidence of coercion through the officers' testimony. But this plan, as the district court aptly observed, is "not trial strategy; it is television fantasy." *Bynum v. Buss,* 2007 WL 1749225, at *5 (N.D. Ind. June 14, 2007); *see also Goodman,* 467 F.3d at 1029 (observing that "[t]here is little tactical wisdom in counsel resting on

his hands and assuming the government would help make the defense case for him"); *Barrow,* 398 F.3d at 605 (rejecting claim that counsel's failure to present any evidence was legitimate strategic move). In any event, the "strategy" failed, as a competent attorney might expect: the officers unanimously and consistently stated that they had not coerced Bynum. And without the admission to coercion that Graddick had hoped the officers would give, he was left with no evidence that Bynum's confessions were coerced. A motion to suppress allegedly involuntary confessions cannot succeed without at least some evidence that the confessions were coerced. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (holding that confession is involuntary only if police coercion or overreaching overbore the accused's will and caused the confession); *Conner v. McBride,* 375 F.3d 643, 651 (7th Cir. 2004) (same).

Moreover, Graddick's reason for keeping Bynum off the stand—that he could not withstand cross-examination and it might prejudice his defense—was baseless. Of course Bynum would have been cross-examined, perhaps rigorously so. But the mid-trial suppression hearing was conducted outside the jury's presence. Under Indiana law, the question whether to suppress the confessions was a question for the judge alone. *See Miller v. State,* 770 N.E.2d 763, 772-73 (Ind. 2002). And in any case, as the district court observed, "testimony on a motion to suppress is not admissible at trial as evidence of the defendant's guilt." *Thomas v. State,* 734 N.E.2d 572, 574 (Ind. 2000). Thus, even if Bynum had crumbled under cross-examination, it would not have affected the jury's estimation of his guilt.

The only way Bynum could have succeeded on his motion to suppress was to put forth evidence of coercion through his own testimony. And any prejudicial testimony Bynum gave at the suppression hearing would not have affected any other part of the proceedings. Graddick thus had no reasonable option but to put Bynum on the stand. Although we review trial counsel's performance deferentially, *see Ben-Yisrayl v. Buss,* 540 F.3d 542, 547 (7th Cir. 2008), we cannot conclude in this case that Graddick's decision to keep Bynum from testifying was sound trial strategy. Rather, it fell well outside the "range of competence demanded by attorneys in criminal cases." *See Strickland,* 466 U.S. at 687; *Barrow,* 398 F.3d at 605. The conclusion reached by the Indiana Court of Appeals, that Graddick's failure to call Bynum as a witness was a legitimate trial strategy, is therefore an unreasonable application of the *Strickland* standard. *See* 28 U.S.C. § 2254(d)(1).

To succeed in obtaining relief, however, Bynum must also show that he was prejudiced by Graddick's ineffectiveness. Under *Strickland,* a defendant must prove that there is a reasonable probability that, but for his lawyer's mistakes, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694; *see also Toliver v. McCaughtry,* 539 F.3d 766, 774 (7th Cir. 2008). A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694; *see also United States v. Wilson,* 237 F.3d 827, 832 (7th Cir. 2001) (noting in different context that "reasonable probability" is not more than 50%). To succeed on this prong of the *Strickland* test, Bynum must show that, had he

testified, there was both a reasonable probability that he would have prevailed on the motion to suppress and a reasonable probability that, if his confessions were suppressed, he would have been acquitted. *Strickland,* 466 U.S. at 694; *Richardson v. Briley,* 401 F.3d 794, 803 (7th Cir. 2006).

We can readily assume that Bynum would have been acquitted had the two confessions been suppressed: the prosecution would have been left with no evidence of Bynum's guilt except the testimony of L.B., significantly weakening the state's case. *See Eckstein v. Kingston,* 460 F.3d 844, 848 (7th Cir. 2006) (observing that verdict that is only weakly supported by the record is more likely to have been affected than one that is overwhelmingly supported). The more difficult question is whether it is reasonably probable that Bynum would have prevailed on the motion to suppress had he testified. And the answer to that question depends on the likelihood that the trial court would have credited Bynum's testimony over the contrary evidence—the three police officers' testimony and Bynum's signed waivers of rights.

We know that the trial court assessed the testimony of the officers (which Bynum had the opportunity to challenge at the suppression hearing) and concluded that they were credible. We must presume that this conclusion was correct, since it was reached after a hearing on the merits and is supported by the record. *See Maggio v. Fulford,* 462 U.S. 111, 116-18 (1983); *Armstrong v. Young,* 34 F.3d 421, 426 (7th Cir. 1994). Although the trial judge did not assess *during the trial* the credibility of Bynum's

allegations of coercion, the judge implicitly made such an assessment during the postconviction proceedings, where Bynum offered his testimony about coercion to that same judge. We may infer from the judge's denial of postconviction relief that he did not think the testimony would have changed the outcome of the suppression hearing. *See United States v. Toro-Pelaez,* 107 F.3d 819, 825 (10th Cir. 1997) (district court's denial of motion to suppress implicitly resolved credibility issues in favor of police officers rather than defendant); *Armstrong,* 34 F.3d at 426-27 (ruling that where one version of facts would have led court to grant motion to suppress, and court denied the motion, federal habeas corpus court could infer that court rejected that version of the facts). It would have been useful had the postconviction court explained why it did not credit Bynum's testimony, but we cannot say that its ultimate conclusion is unreasonable or that the Indiana Court of Appeals unreasonably adopted it. We conclude, therefore, that the Court of Appeals permissibly ruled that it was not reasonably probable that Bynum would have prevailed on the motion to suppress had he testified.

The decision of the Indiana Court of Appeals on the question of prejudice is acceptable for another reason. That court filled in the gap left by the postconviction court by reasonably answering the question of how to weigh Bynum's testimony against the officers' testimony and the signed waiver forms:

> At trial, the three detectives provided consistent testimony that contradicted Bynum's assertions and the State introduced Bynum's two signed waiver

forms executed before each statement was made. Bynum is correct that a defendant's assertions cannot be discounted merely because of his status as a defendant or the heinousness of the underlying crimes. But a court also cannot be expected to accept wholesale unsubstantiated accusations of egregious police misconduct.

This conclusion is not based on an unreasonable understanding of *Strickland* or an unreasonable view of the facts. *See* 28 U.S.C. § 2254(d). Even if Bynum had testified, the only support for his claims of coercion would have been his own uncorroborated and self-serving testimony. He did not present any physical evidence of coercion or first-hand witness accounts of the interrogations. Without more support to Bynum's story, it was permissible for the state appellate court to conclude that there was not a reasonable probability that the trial court would have accepted Bynum's version of events. *See Mahaffey v. Page,* 151 F.3d 671, 683-84 (7th Cir. 1998) (holding that petitioner was not prejudiced by counsel's decision not to call sole witness to petitioner's alleged beating at suppression hearing because testimony of arresting officers and assistant attorneys, as well as absence of physical evidence of coercion, made it unlikely that motion to suppress the confessions would have been granted), overruled on other grounds by *Mahaffey v. Page,* 162 F.3d 481 (7th Cir. 1998); *United States v. Madison,* 689 F.2d 1300, 1308 (7th Cir. 1982) (holding that consistent testimony given by three officers made it unlikely that defendant's motion to suppress his confession as coerced would have been granted even though two witnesses to the interrogation had not testified at

suppression hearing); *see also United States v. Dean*, 550 F.3d 626, 630 (7th Cir. 2008) (trial court's decision to credit testimony of two officers over that of defendant was not clearly erroneous where there was no evidence that officers had testified untruthfully). The state courts' judgment that Bynum did not satisfy the prejudice prong of *Strickland* is thus within the "boundaries of permissible differences of opinion." *Jackson*, 348 F.3d at 662.

## III.

The district court correctly denied Bynum's petition for a writ of habeas corpus. Bynum's claim that his trial counsel was ineffective for failing to put him on the stand to testify at his suppression hearing required him to show both that counsel was ineffective and that counsel's mistakes prejudiced him. Although we conclude that counsel was ineffective, Bynum was not prejudiced. The state courts ruled that it was not reasonably probable that, had Bynum testified, he would have succeeded on his motion to suppress. This conclusion was neither contrary to Supreme Court precedent nor based on an unreasonable determination of the facts in light of the evidence presented at Bynum's trial and at the postconviction evidentiary hearing. The state court therefore reasonably concluded that Bynum was not prejudiced by his attorney's failure to have him testify at the suppression hearing.

AFFIRMED.