In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 06-2768 & 06-3281

WILLIE POLE,

*Petitioner-Appellant,*

*v.*

AUSTIN RANDOLPH, Acting Warden
of Logan Correctional Center,

*Respondent-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 3393—**Charles R. Norgle, Sr.,** *Judge.*

ARGUED SEPTEMBER 21, 2007—DECIDED JULY 7, 2009

Before EASTERBROOK, *Chief Judge*, and KANNE and
ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Willie Pole was convicted of
first degree murder and attempted armed robbery in
the State of Illinois. He appeals the denial of his petition
for a writ of *habeas corpus*, arguing that his attorney pro-
vided ineffective assistance at his trial and on appeal.
We affirm the district court's denial of his petition.

**I.**

We begin with the facts as presented at trial. Bernard Jackson went to work on September 27, 1994, even though it was his day off. Accompanied by his girlfriend, Carmania Payton, and his seven-year-old son, Terrence, he hoped to earn some extra money at the E & J Tire Service shop where he worked with his brother, Larue. Bernard arrived at the shop a few hours before its 7 p.m. closing time, joining his brother and another worker, Antoine Patillo. Patillo left work a little early that day and shortly after he left, Willie Pole arrived at the shop looking for him. Pole asked Larue where Patillo was, and Larue told him Patillo had just left. As the two men were talking, a red van pulled into the shop. Three men in the van wanted to exchange the van's tires with replacements they were carrying in the back of the vehicle. Even though the shop's owner was about to close for the day, Bernard offered to stay and change the tires. While Bernard waited on the men in the van, Pole asked Larue whether the three men were members of the Gangster Disciples street gang. Larue replied that he did not know. Pole then used a payphone at the shop to make a call, and Larue left work to go to a nearby store. The shop's owner went to a business next door to the tire shop, leaving Bernard to work on the van.

Pole was a member of the Blackstone gang, a rival of the Gangster Disciples. After making a phone call, he left the shop and met up with other members of the Blackstones, including Ramon Hamilton. He told Ramon about the Disciples at the tire shop, and they

hatched a plan to rob the Disciples of their jewelry. They drove past the shop to verify that the men were still there, and made gang signs identifying themselves and disparaging their rivals. They parked and began to approach the tire shop through the alley behind it. Pole pulled up his hood to hide his face. Ramon carried a handgun and wore a ski mask.

Two of the men that Pole believed were Disciples were standing near the van at the time. The third was inside the shop. Carmania Payton and Terrence were also standing near the van, a few feet away from Bernard as he worked to change the tires. The shop's owner was just returning because someone had come to tell him there was going to be trouble at the shop. After asking Bernard if everything was alright, the shop's owner turned to walk away. As he turned, he heard a gunshot. Although Pole now denies that he pulled the trigger, he later told the police that Ramon showed him how to release the safety, and he pointed the gun at the Disciples standing near the van and fired. He was standing forty or fifty feet away from his target at the time. The badly aimed bullet struck Bernard in the back and exited through his chest. He fell to the ground in front of his girlfriend and son, exclaiming, "I think I'm hit." The shop's owner called for everyone to get down. Willie Pole and Ramon Hamilton fled the scene. When everything appeared to be clear, everyone stood up except Bernard.

Pole placed the gun in his car, but then abandoned the car. He and Ramon fled in separate directions. Larue

returned to a frantic scene. The police and an ambulance were summoned, and Bernard was pronounced dead at a nearby hospital less than an hour later. Larue and other witnesses at the scene told the police about Pole's visit to the shop, his inquiry about the men in the van, and the car that drove by flashing gang signs before the shooting. The police began to look for the car. At about this same time, Pole showed up at Ramon Hamilton's house. Ramon's twelve-year-old sister, Andrea Hamilton, answered the door. Pole asked her to walk with him to retrieve his car because there were police in the area. As Andrea and Pole walked to the car, they met Karen Wills, a friend of Andrea's, and she joined them in the walk back to the car. When they got to the car, Pole removed a gun and a glove from the car and handed them to Andrea, asking her to hide them for him. He told her he had shot a "Sipe," i.e., a Disciple, and he instructed her to place the gun in the front of her pants. All three entered the car and Pole drove Andrea home. Andrea hid the gun, still loaded except for the single spent bullet, in a drawer and placed the glove on her dresser. After dropping Andrea off, Pole told Karen Wills that he had confronted some Disciples and fired a shot at them.

Two police officers spotted Pole and Wills shortly thereafter, in a car matching the description given by witnesses to the crime. They took the two into custody and at approximately 8:30 p.m., witnesses from the tire shop confirmed that Pole was the man who had asked about the alleged Disciples and then flashed gang signs shortly before the shooting. Wills told the police

that she did not know what was going on, but that Pole had given a package to Andrea Hamilton. Pole and Wills then led the police to the Hamilton home. In the meantime, Ramon Hamilton had arrived home and learned that Pole had asked Andrea to hide the gun. Ramon took the gun from Andrea's drawer and hid it outside his house. When the police arrived, Andrea told them she had given the gun to Ramon, who subsequently handed over to the police officers both the gun and the glove. Pole's name was written on the glove. The officers took Pole, Wills, Ramon and Andrea Hamilton and the Hamiltons' mother, Bonnie, to the police station for questioning.

Two officers questioned Pole at first. He told them he had gone to the tire shop to see Patillo, who owed him some money. After he saw the three men he believed were Gangster Disciples, he went around the corner and told some of his cohorts from the Blackstones that there were "Sipes" at the tire shop. The Blackstones got into two cars and drove past the tire shop. Pole told the officers that, at Ramon's suggestion, the Blackstones decided to rob the Disciples. Ramon retrieved a gun from his house, and Pole told the officers he went along because he was considered a "pigeon" or a "white boy" among the Blackstones and he wanted to prove himself. In this first statement, Pole told the police that Ramon was showing him how to work the safety on the gun when it accidentally discharged in the direction of the van. Pole told the officers that he panicked and ran.

After questioning Ramon, the officers came back to Pole and told him his story did not match Ramon's version

of events. Pole then told the officers a story similar to his first account, but this time stated that Ramon was wearing a ski mask, and that Ramon directed Pole to put up his hood as they walked through the alley toward the back of the tire shop. In this second version, Pole admitted that he pointed the gun at the men near the van and fired a single shot before fleeing.

The police officers and an assistant state's attorney ("ASA"), Tom Biesty, then interviewed Andrea and Ramon Hamilton, and Karen Wills as well, taking written statements from each before returning to Pole to record his statement.[1] ASA Biesty took Andrea Hamilton's statement at 1:30 a.m., and she confirmed that Pole had asked her to walk to the car with him. She reported that Pole told her he had shot someone at the tire shop, and that they met up with Karen Wills on the way to Pole's car. She said that Pole asked her to hide the gun and glove once they reached the car. She had given the gun to her brother Ramon when he came home asking about it. Both Andrea and Bonnie Hamilton signed each page of Andrea's statement.

At 4:20 a.m., approximately nine hours after the shooting, ASA Biesty recorded Ramon's statement. Ramon told Biesty that Pole came to his house after

---

[1] Karen Wills' statement is not part of the record on appeal but Pole seems to concede that her trial testimony was consistent with her written statement. Bonnie Hamilton was present for the questioning of both Ramon and Andrea because they were minors.

spotting the Gangster Disciples at the tire shop. Pole asked Ramon for a gun so that he could rob the Blackstones of their jewelry. Ramon and Pole drove past the shop in separate cars, Ramon with three other Blackstones—Lontray, Thaddeus and Thomas—and Pole driving behind them in his own car. The group flashed gang signs and then parked in the alley behind the shop. Ramon released the safety on the gun at Pole's request, and Pole then walked toward the shop and fired a shot at the Disciples. The two fled in different directions but met up again later. Pole told Ramon that he had given the gun to Andrea. Ramon went home and retrieved the gun from Andrea and hid it near the side of his house. Both Ramon and his mother, Bonnie Hamilton, signed each page of his statement.

ASA Biesty then met with Pole to take his statement. The shooting had occurred between 7 and 8 p.m., and it was now 6:45 a.m., approximately eleven hours after Pole had been taken into custody. As ASA Biesty later testified, he sat next to Pole, read him his rights, and wrote out Pole's statement by hand. Biesty had Pole read back to him the first paragraph of the statement to make certain that Pole could read and understand it. In the statement, Pole admitted he was a member of the Blackstone gang. He told Biesty that after seeing the three men at the tire shop, he went to Ramon's house and met with Ramon, Lontray, Thaddeus and Thomas, fellow Blackstones that Pole identified only by their first names. Ramon suggested that they rob the Disciples of their jewelry. Ramon told the group that he had a gun. Pole told ASA Biesty that he took the gun from

Ramon and that they then drove up to the alley behind the tire shop. There, Pole put on a white work glove marked with his name, the same glove later retrieved from Ramon's house. He pulled up the hood of his sweatshirt and Ramon put on a ski mask. They agreed that Pole would hold the gun on the Disciples while Ramon searched their pockets and took their jewelry. Pole asked Ramon to take the safety off the gun, and Ramon complied. Pole told ASA Biesty that he "popped a round off" at the Disciples and that he and Ramon then fled. Pole said that he returned to his car with Andrea, told her he had "popped" some Disciples, and asked her to hide the gun and glove. Pole signed each page of the statement and also initialed a change in the spelling of Ramon's name.

Ramon pled guilty to murder and attempted armed robbery, but Pole went to trial. Pole's attorney moved to suppress any oral or written statements that Pole made the night he was arrested, claiming that he was not read his rights prior to interrogation, that his statements were not made knowingly or voluntarily, that his lengthy interrogation continued after he invoked his right to remain silent and his right to an attorney, that his statements were the result of physical and psychological coercion, that his statements were provoked by confronting him with evidence obtained in violation of the Fourth Amendment, and that authorities lied to Pole in violation of the Fifth and Fourteenth Amendments. Counsel sought and obtained a hearing on the motion to suppress. At the hearing, the State presented testimony from the police officers involved in Pole's arrest and

interrogation, and ASA Tom Biesty, all of whom refuted Pole's allegations. Pole's attorney did not call Pole as a witness and presented no evidence at the hearing, relying entirely on cross-examinations of the state's witnesses to make his case. He argued that Pole was only eighteen years of age at the time of the interrogation, had limited education, had never been interrogated before, was in custody for many hours before he signed the confession and did not give the statement voluntarily. The court found that the state's witnesses were credible, that Pole had been apprised of his rights prior to inter-rogation and that there was no evidence of coercion. The court denied the motion to suppress.

At the trial, Andrea Hamilton testified consistently with her signed statement. Karen Wills testified that she had encountered Pole and Andrea when she was walking home on the day of the murder. She went with them to retrieve Pole's car. When they arrived at the car, she saw Pole give Andrea a black, metal object, and heard him ask Andrea to "put it up" for him. After drop-ping off Andrea at her home, Pole told Karen Wills he had "gotten into it" with some Disciples and that he had shot at them. Wills testified that shortly thereafter, she and Pole were stopped by the police. After Wills told the officers she had seen Pole give something to Andrea, the police officers drove the pair to Andrea's house. The officers later emerged from the house with all three Hamiltons.

Pole's written confession was entered into evidence, and the officers and ASA Biesty testified about Pole's

oral and written admissions made within hours of the murder. A forensic investigator for the police department testified that no physical evidence was found at the scene, a gunshot residue test of Pole's hands was taken but he did not know the result, and no bullet had been recovered because it had passed through the victim's body, exiting his chest. One of the officers testified that he found a shell casing matching the gun in the grass near the scene. Pole's attorney argued to the jury that the shooting was accidental, that no robbery was intended and no steps had been taken towards a robbery, and that the gun had discharged unexpectedly while the safety was being manipulated. The attorney successfully argued over the prosecution's objection that the jury should be instructed on involuntary manslaughter as an alternative to murder. This was not a small victory given that Pole was charged with murder and attempted armed robbery, allowing the state to argue that he either intentionally shot at the Disciples or that Bernard Jackson was killed in the course of another felony. Under the felony murder theory, Pole's argument that he did not intentionally shoot at Bernard Jackson would not have entitled him to an involuntary manslaughter instruction unless there was some evidence that he did not intend to commit robbery together with evidence that the shooting was accidental. Except for Pole's initial statement to the police, there was no evidence in the record supporting an involuntary manslaughter charge. The court called it a close issue, but gave Pole the benefit of the doubt and issued the involuntary manslaughter instruction. Perhaps because Pole

had confessed to at least five different people within twelve hours of the murder and had signed a written statement detailing his actions that night, the jury had little trouble returning a verdict finding him guilty of murder and attempted armed robbery.

When the ink was barely dry on the verdict form, Pole began complaining at his sentencing hearing that he did not commit the crime, that his attorney failed to place into evidence reports that no gunshot residue was found on his hands or his glove, that he had wished to testify but had deferred to his lawyer's judgment out of fear, and that he had been manipulated and coerced into signing a confession. He claimed he had been led to believe that the state's attorney was there to help him, and that he was young, inexperienced and exhausted when he signed the confession. The court rejected Pole's claim of innocence and sentenced him to forty-four years of imprisonment on the murder charge and fifteen years on the attempted armed robbery conviction, to be served concurrently.

## II.

In his direct appeal, Pole argued that the trial court failed to adequately inquire into his post-trial complaint that his lawyer had failed to call a witness with exculpatory evidence. He also contended that the trial court had erred in allowing the jury to hear evidence regarding Pole's membership in a street gang. The exculpatory evidence, Pole explained, consisted of two favorable gunshot residue tests. Pole contended that the swabs of

his hands and tests of the glove were negative for gunshot residue, and that the trial court should have conducted an inquiry into his charge at sentencing that his attorney failed to put into evidence the negative gunshot residue test reports. Pole did not submit those reports with his appeal. The appellate court noted that Pole had not adequately raised the issue of ineffective assistance of counsel because he did not request new counsel and filed no *pro se* post-trial motion. The court nevertheless considered the merits of Pole's claim, and determined that counsel's strategy was to inform the jury that the gunshot residue test was conducted but that the prosecutor had not presented the results, leaving the jury to infer the reports would have been favorable to Pole. The appellate court continued that even if the attorney erred in not going farther with this evidence or the trial court erred in not pursuing Pole's allegation about his lawyer, there was no reasonable probability that the outcome of the trial would have been any different had this evidence been admitted. The court noted that the gunshot residue tests held little evidentiary value in light of Pole's signed confession and the other ample evidence against him. Because the court did not know the test results for Pole's hands or the glove, and because the other evidence of his guilt was overwhelming, the court concluded that Pole had failed to show prejudice from the alleged errors.

Addressing Pole's claim that the court erred in admitting evidence of his gang membership, the appellate court found that this evidence was highly relevant to the crime charged because the shooting was alleged to be

motivated by gang rivalry. One of the three men in the red van had been wearing the colors of the Gangster Disciples, and Pole had asked Larue about the men's gang affiliation shortly before the shooting. Moreover, Pole had confessed to a police officer that he went to confront the Disciples because the Blackstones considered him a "pigeon" or a "white boy" and he wanted to prove himself to his fellow gang members. Finally, the court rejected Pole's argument about the gang affiliation evidence because the state had used the evidence only for proper purposes throughout the trial. The appellate court therefore affirmed Pole's conviction. The Illinois Supreme Court declined to hear Pole's case on direct appeal.

Pole then filed a *pro se* petition for post-conviction relief in the state court, citing three grounds for relief. First, he contended that his trial attorney was ineffective for failing to present witnesses at the hearing on the motion to suppress and for not allowing Pole himself to testify at the motion to suppress. Second, he argued that his trial counsel was ineffective because he failed to investigate exculpatory witnesses and eyewitnesses to the crime, and did not allow Pole to testify in his own defense. Third, he claimed that his appellate counsel was also ineffective for failing to raise in his direct appeal the issues he was now raising in his post-conviction petition. He filed numerous statements in support of his post-conviction petition including three affidavits of his own (R. 13, at C51, C57 and C61), an affidavit from Andrea Hamilton (R. 13, at C72), an affidavit from Ramon

Hamilton (R. 13, at C63),[2] an affidavit from Bonnie Hamilton (R. 13, at C78), and statements from his mother (R. 13, at C83), sister (R. 13, at C84 and C85), and a fellow inmate (R. 13, at C81) supporting his requests for relief. The circuit court dismissed the petition without an evidentiary hearing and Pole appealed.

The Illinois Appellate Court took up Pole's case for a second time. In response to the state's argument that Pole had waived the arguments he was now raising, the court relaxed the rule for waiver because Pole claimed ineffective assistance both at trial and on appeal. The court therefore decided to address Pole's arguments on their merits. On the ineffective assistance claim based on counsel's performance at the suppression hearing, the appellate court reviewed the hearing transcript and determined that the claim was without merit. Specifically, the court noted that defense counsel's strategy was to paint his client as so young, inexperienced and naive about the justice system that his confession was involuntary. To that end, he cross-examined the state's witnesses and argued his position to the court. The court found that counsel's conduct was not substandard.

In addressing Pole's claim that his trial lawyer failed to investigate the case by failing to locate and call two eyewitnesses, Ramon Hamilton and Lontray, the court

---

[2] Like Pole, Ramon signed a confession in the early morning hours of September 28, 1994, fewer than twelve hours after the murder. Ramon executed his affidavit more than four years later, in November 1998.

opined that there was no factual basis to support the claim. The court concluded (erroneously, as it turns out) that Ramon's affidavit indicated that Ramon was not present when the fatal shot was fired. Pole had not submitted an affidavit from Lontray. Because Ramon and Lontray could not have provided testimony that would have changed the outcome of the trial, the court found the argument without merit. The court therefore affirmed the dismissal of the post-conviction petition, and the Illinois Supreme Court again declined to hear the appeal.

Pole then brought his case to federal court, seeking *habeas corpus* relief based on ineffective assistance of counsel. Pole listed two specific instances of ineffective assistance of trial counsel: (1) counsel's refusal to allow Pole to testify at the hearing on the motion to suppress; and (2) counsel's failure to adequately investigate his case. Pole contended that the motion to suppress was critical to his case because a signed, written statement implicating him in the shooting was the state's best evidence. Indeed, Pole argued, the prosecution had no physical evidence linking him to the crime and presented no eyewitnesses who could identify the shooter. More-over, there was no real down side to Pole testifying, and no chance of winning the motion without Pole's testimony. Only he could have provided evidence that he was tricked into signing the confession because he was extremely tired and high on marijuana, according to Pole. He also argued that there was no strategic reason for the failure to call him as a witness at the suppression hearing. In explaining counsel's inadequate investiga-

tion, Pole noted that the affidavits he supplied constituted new evidence that corroborated his account of the shooting and undercut the state's theory. The new evidence, according to Pole, consisted of recantations of testimony of two of the state's witnesses. Finally, Pole argued that his appellate lawyer should have raised the ineffective assistance of counsel issue in his direct appeal.

The district court denied Pole's *habeas* petition without a hearing. The court adopted the factual findings of the Illinois appellate court in its unpublished order deciding the direct appeal. The court began by considering whether Pole had adequately presented his federal claims to the state courts because any claim not presented to the state's highest court is deemed procedurally defaulted. The court also noted that a federal court on *habeas* review could not consider claims that a state court had decided on state law grounds that were independent of the federal question and adequate to support the judgment. The court noted as an example of this rule the issue of waiver, which is considered an independent and adequate state law ground that bars *habeas* relief. The court also noted, however, that waiver bars federal review only when the last state court to consider the question actually relied on procedural default as the basis for its decision. Turning to Pole's claim of ineffective assistance of counsel, the court found that Pole raised these issues in his direct appeal, that the Illinois Appellate Court's decision was based on independent state grounds adequate to support the judgment, and

that the issues were therefore procedurally barred under 28 U.S.C. § 2254.[3]

The court nonetheless considered the issues on their merits. The court rejected Pole's claim that his attorney was deficient for failing to call him as a witness at the critical suppression hearing, instead relying on the state's witnesses. According to Pole, it was unreasonable to expect the state's witnesses to support Pole's version of events. But the court declined to second-guess counsel's strategic decision to rely on cross-examination and not present Pole as a witness. As for Pole's complaint that trial counsel failed to investigate his case, the district court found the supporting affidavits insufficient. Repeating the error that the Illinois Appellate Court made in deciding the post-conviction appeal, the district court found that Ramon's affidavit indicated he was not present at the time of the shooting, and that information supplied by Ramon would not have changed the outcome of the trial, negating any claim of

---

[3] This finding is puzzling because the only issues Pole raised in his direct appeal were related to the failure of his attorney to bring in evidence of the favorable gunshot residue tests and the trial court's decision to allow evidence of his gang affiliation. Perhaps the district court meant to refer to the Illinois Appellate Court's decision on the appeal of the dismissal of Pole's post-conviction petition, where Pole did raise many of the issues he raises here. However, the Illinois Appellate Court expressly declined in that decision to apply waiver to Pole's claims, and therefore the decision was not based on independent state grounds adequate to support the conviction.

ineffective assistance. Finally, because the district court
had already concluded that trial counsel was not ineffec-
tive, the court also rejected Pole's claim that his appellate
counsel was ineffective for failing to raise the issue of
trial counsel's ineffectiveness. The court therefore denied
Pole's petition.

Within ten days, Pole filed a *pro se* motion for recon-
sideration, again claiming ineffective assistance of counsel.
While that motion was pending, Pole filed a notice of
appeal from the court's order denying his petition. He
also requested a certificate of appealability from the
district court. The court granted the certificate of appeal-
ability and then dismissed the motion to reconsider. The
court found that it lacked jurisdiction over the motion
to reconsider because it was an unauthorized attempt to
litigate a successive collateral attack on his sentence
without the permission of the court of appeals. Pole then
filed an amended notice of appeal that added the denial
of the motion to reconsider, and requested that this court
grant a certificate of appealability with respect to that
claim. In an Order issued on January 18, 2007, we found
that the district court erred in characterizing the motion
to reconsider as a successive *habeas* petition. We held that
the district court should have treated the motion as a
timely filed motion for reconsideration and decided it on
the merits. We therefore amended the certificate of
appealability granted by the district court to include
the denial of the motion for reconsideration and consoli-
dated his appeal of the denial of the motion to recon-
sider with his original appeal of the denial of his petition.

*See generally Pole v. Firkus*, Case Nos. 06-2768 & 06-3281, Order (7th Cir. Jan. 18, 2007). We now consider Pole's appeals.

## III.

On appeal, Pole contends that he is entitled to *habeas* relief because his lawyer's assistance did not satisfy constitutional minimums. Pole now cites five instances of counsel's errors: (1) the failure to introduce the results of the gunshot residue tests; (2) the failure to interview or call Ramon Hamilton, an eyewitness whose testimony would have exonerated Pole; (3) the failure to interview key prosecution witnesses; (4) the failure to interview or call other identified eyewitnesses; and (5) the failure to call Pole to testify at the suppression hearing. Pole also maintains that the district court erred in concluding that his entitlement to *habeas* relief is procedurally barred. The state counters that Pole forfeited any argument that the state court unreasonably interpreted Ramon Hamilton's affidavit. Moreover, the state adds, Pole's *habeas* petition argued only two operative facts in support of his ineffective assistance claim, forfeiting or procedurally defaulting all others including his contention about counsel's failure to present the gunshot residue evidence. Addressing Pole's remaining claims for ineffective assistance individually and as a whole, the state posits that Pole has not met his burden of demonstrating that counsel's performance fell below constitutional minimums.

**A.**

We must begin by sorting out the appropriate standards of review and whether certain claims have been waived or procedurally defaulted. Our review of the district court's decision to deny Pole's *habeas* petition is *de novo,* and is governed by the terms of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *Mack v. McCann,* 530 F.3d 523, 533 (7th Cir. 2008); *Julian v. Bartley,* 495 F.3d 487, 491-92 (7th Cir. 2007). *See also Jackson v. Frank,* 348 F.3d 658, 661 (7th Cir. 2003); 28 U.S.C. § 2254. "Habeas relief must not be granted unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Julian,* 495 F.3d at 492. *See also Jackson,* 348 F.3d at 662; 28 U.S.C. § 2254(d). "In assessing the reasonableness of the state court's decision, the federal court assumes that the state court's factual determinations are correct unless the defendant rebuts them with clear and convincing evidence." *Julian,* 495 F.3d at 492. *See also* 28 U.S.C. § 2254(e)(1).

The Supreme Court set forth the legal principles that govern claims of ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668 (1984). *See also Wiggins v. Smith,* 539 U.S. 510 (2003). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that

the deficiency prejudiced the defense." *Wiggins*, 539 U.S. at 521 (citing *Strickland*, 466 U.S. at 687). To demonstrate that counsel's performance was deficient, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521. That objective standard of reasonableness, in turn, is determined by prevailing professional norms. *Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521.

To demonstrate prejudice from counsel's deficient performance, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a defendant is unable to make a sufficient showing on either component of the *Strickland* standard, we need not consider the other component. *Strickland*, 466 U.S. at 697. *See also Pearson v. Callahan*, 129 S. Ct. 808, 821 (2009) (reaffirming the holding of *Strickland* that leaves to the sound discretion of the lower courts to determine the order of deciding the two components).

"[I]neffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed." *Peoples v. United States,* 403 F.3d 844, 848 (7th Cir. 2005). We assess counsel's work as a whole, and "it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief." *Id*. Under Section 2254's exhaustion requirement, the peti-

tioner must assert his federal claim through one com-
plete round of state-court review, either on direct appeal or
in post-conviction proceedings. *See* § 2254(b)(1)(A); *Stevens
v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007), *cert. denied*,
128 S. Ct. 2429 (2008); *Lewis v. Sternes*, 390 F.3d 1019, 1025
(7th Cir. 2004). Adequate presentation of a claim to the
state courts requires the petitioner to present both the
operative facts and the legal principles that control each
claim. *Stevens*, 489 F.3d at 894. *See also Thompson v. Battaglia*,
458 F.3d 614, 616 (7th Cir. 2006) (noting that the Rules
Governing Section 2254 Cases in the United States District
Courts require a petitioner to specify all grounds of relief
available to him and the facts supporting each ground).
Thus, if a petitioner fails to assert in the state courts a
particular factual basis for the claim of ineffective assis-
tance, that particular factual basis may be considered
defaulted. *Stevens*, 489 F.3d at 894 ("the failure to alert
the state court to a complaint about one aspect of
counsel's assistance will lead to procedural default").

### 1.

Acknowledging these familiar standards, the state
asserts there is a "wrinkle" in determining the correct
standard of review here. The state notes Pole's argument
that both the state appellate court and the district court
described Ramon Hamilton's affidavit inaccurately, and
that, according to Pole, this was an unreasonable deter-
mination of the facts in light of the evidence presented
in the state court proceeding under § 2254(d)(2). Although
conceding that both courts did, in fact, read the affidavit

incorrectly, the state argues that Pole forfeited any claim under § 2254(d)(2) regarding Ramon's affidavit by failing to preserve it in the district court. The state further maintains that, even if Pole adequately preserved the issue in the district court, we should nevertheless apply § 2254(d)(1) deference to the portions of the state court analysis that were unaffected by the state appellate court's factual findings regarding Ramon Hamilton's affidavit.

We consider the claim of forfeiture first. Looking to Pole's pleadings in the district court, we note first that, in his *habeas* petition, Pole correctly described Ramon's affidavit in detail and attached it to his petition. R. 1-1. In his brief on the *habeas* petition, he argued that the state court "erroneously concluded that Ramon's affidavit did not place him at the scene." R. 31, at 14. After quoting Ramon's affidavit to illustrate the state court's error, Pole's counsel argued that this "gross misrepresentation of the contents" of Ramon's affidavit, in combination with the other affidavits submitted, proved that the state court unreasonably applied the facts. Later, when it became apparent that the district court had nonetheless made the same mistake as the state appellate court, Pole again pointed out the error in his motion for reconsideration. We find that Pole adequately preserved for review his claim under § 2254(d)(2) that the state appellate court misread Ramon's affidavit, and its decision was thus based, at least in part, on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

As we noted, both the state and district courts concluded from the affidavit that Ramon was not present at the shooting. That conclusion was inexplicable. Ramon stated in the affidavit that he brought the gun to the confrontation and that it discharged as he and Lontray both tried to take the gun from Thaddeus in order to set the safety. R. 13, at C63, ¶¶ 11-15. By every account of the crime, including the state's version, Ramon was present at the shooting. Indeed, Ramon pled guilty to the same murder and attempted armed robbery charges that Pole faced. Pole has thus clearly and convincingly rebutted the determination that Ramon was not present at the shooting. The question now is what effect that error has on our review of Pole's claims in general. The state posits that, even if Pole preserved that claim, and we find that he did, § 2254(d)(1) deference should still apply to any part of the state court's analysis that was not affected by that error. Pole does not argue otherwise.

In *Wiggins*, the Supreme Court analyzed a *habeas* claim based on ineffective assistance of counsel where the state court made a similar factual error in its analysis of Wiggins' claim. 539 U.S. at 528. Wiggins' lawyer claimed to have been aware of severe sexual abuse his client suffered as a child, citing two documents the lawyer possessed. The lawyer claimed that, based on the information contained in these documents, he made an informed and reasoned decision not to pursue the history of abuse further or present it to the jury in mitigation at sentencing. As the state conceded on appeal, however, neither document contained any information about the sexual abuse Wiggins suffered as a child. The Supreme Court stated:

> The state court's assumption that the records docu-
> mented instances of this abuse has been shown to
> be incorrect by "clear and convincing evidence," 28
> U.S.C. § 2254(e)(1), and reflects "an unreasonable
> determination of the facts in light of the evidence
> presented in the State court proceeding," § 2254(d)(2).
> This partial reliance on an erroneous factual finding
> further highlights the unreasonableness of the state
> court's decision.

*Wiggins*, 539 U.S. at 528. The *Wiggins* Court had other grounds for finding counsel's performance deficient but clearly used this single factual error to support its conclusion that the state court's decision was unreasonable under the standards of § 2254. We will therefore consider the factual error regarding Ramon's affidavit in combination with his other claims in determining whether the state court unreasonably applied *Strickland* to the facts here. *See Wiggins*, 539 U.S. at 520 ("We have made clear that the 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case.").

### 2.

Oddly, the state concedes in one part of its brief that the gunshot residue claim was fairly presented to and adjudicated by the state appellate court (Brief of Respondent-Appellee, at 24, (7th Cir. Apr. 25, 2007)

(hereafter "State's Brief")), but then later argues that Pole procedurally defaulted the gunshot residue claim in the state court (State's Brief at 32-33). Fair presentment of an issue requires a petitioner to put forward both the operative facts and the controlling legal principles. *Sanders v. Cotton*, 398 F.3d 572, 580 (7th Cir. 2005). *See also Baldwin v. Reese*, 541 U.S. 27, 32 (2004) ("ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."). According to the state, the state court held that Pole did not adequately raise the issue of trial counsel's ineffectiveness for failing to present the gunshot residue results. R. 1-1, Appx. 1, at A-9. On direct appeal, the state court indeed said that Pole had not adequately raised the issue of ineffective assistance related to the gunshot residue evidence, but the court then nonetheless addressed that claim on the merits. The court found that counsel was not ineffective because he placed before the jury the fact that the residue test had been taken and that the prosecution had not put the results into evidence. The state court found it was a reasonable strategy to imply to the jury that the results favored Pole. Because counsel on appeal also did not submit the results of the gunshot residue test to the state appellate court, that court also found that Pole failed to show prejudice from counsel's failure to place the actual test results before the jury.

Similarly, in post-conviction proceedings, the state appellate court refused to treat the claim of ineffective

assistance of trial counsel as waived because Pole had also alleged ineffective assistance of appellate counsel. The state post-conviction court thus addressed Pole's claim of ineffective assistance on the merits, expressly finding that, under these circumstances, "strict application of waiver should be relaxed to give defendant a fair opportunity to present his argument." *People v. Pole*, No. 1-99-0858, at 4 (Ill. App. 1 Dist. April 13, 2001). That Pole may have failed to abide by a state procedural rule does not necessarily preclude this court from hearing his claim. *See Harris v. Reed*, 489 U.S. 255, 262 (1989) ("a federal claimant's procedural default precludes federal habeas review, like direct review, only if the last state court rendering a judgment in the case rests its judgment on the procedural default."). "[T]he state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). *See also Harris*, 489 U.S. at 261-62. The Supreme Court also set a "plain statement" rule to govern the analysis of whether the state court rested its judgment on a procedural default: "[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263 (quoting *Caldwell*, 472 U.S. at 327). *See also Smith v. Battaglia*, 415 F.3d 649, 653 (7th Cir. 2005) (same); *Sanders v. Cotton*, 398 F.3d 572, 580 (7th Cir. 2005) (where the state appellate court's discussion of waiver is intertwined with its merits analysis, the state court's decision does not rest

on an independent and adequate state law ground). The state can point to no such statement here, and indeed the last state court to consider the gunshot residue issue expressly declined to rest on a procedural bar and instead decided the issue on the merits. We therefore decline to find that the claim was procedurally defaulted in the state court.

But the state is correct that Pole did not argue, in either his *habeas* petition or his brief in the district court, the issue of his lawyer's failure to present the gunshot residue test, and therefore forfeited it in federal proceedings. *See Martin v. Evans*, 384 F.3d 848, 853 (7th Cir. 2004) (a defendant who fails to present a specific ground of trial counsel's ineffectiveness in the district court has waived the issue). *See also Stevens*, 489 F.3d at 894 (the failure to alert a state court to a complaint about one aspect of counsel's assistance will lead to a procedural default), *Peoples*, 403 F.3d at 848 ("one who makes and loses a contention that counsel was ineffective for four reasons cannot start over by choosing four different (or four additional) failings to emphasize"). A party may not raise an issue for the first time on appeal. *Domka v. Portage County, Wisconsin*, 523 F.3d 776, 783 (7th Cir. 2008) (where a party raises a specific argument for the first time on appeal, it is waived even though the "general issue" was before the district court). Pole claims that his filings in the district court were replete with references to his lawyer's failure to raise the results of the gunshot residue tests. Simply referring to the gunshot residue test, of course, is not enough to preserve the ineffectiveness issue for review in this court. *Kunz v.*

*DeFelice*, 538 F.3d 667, 681 (7th Cir. 2008) (failure adequately to present an issue to the district court waives the issue on appeal).

Pole details his references to the gunshot residue test in the district court in his reply brief on appeal. We recount them here to demonstrate why we find the issue forfeited. First, Pole states that the issue was raised in the state appellate court's decision on direct appeal and that the state court's decision, in turn, was "discussed" in his federal *habeas* petition. In the *habeas* petition, Pole complained that the state appellate court, in ruling on his direct appeal, faulted him for failing to file a post-trial motion claiming ineffective assistance, failing to request appointment of new counsel, and making only a general statement regarding the evidence he believed should have been presented at trial. Pole then noted, "However, the evidence Petitioner referred to was a ballistics report that conclusively shows that no gunshot residue was found on the gloves he allegedly was wearing when the fatal shot allegedly was fired." R. 1-1, at ¶ 72. This passage in the *habeas* petition merely recounted the state court's ruling on direct appeal. But simply rehashing another court's ruling on the subject, without supplying supporting facts and legal argument, is not enough to alert the district court that he was raising this issue as a basis for his claim of ineffective assistance. *See Winsett v. Washington*, 130 F.3d 269, 273-74 (7th Cir. 1997) (where the only reference to the voluntariness of a confession in a *habeas* petition is a recapitulation of the state trial court's ruling on the subject without facts or legal arguments in support of a claim of involuntariness, the claim is

waived). Second, in his *habeas* brief, Pole notes that he filed affidavits in support of his post-conviction petition, detailing what happened on the night of the shooting. He recounts information from one of those affidavits: "Petitioner was arrested later that night and taken to a police station, where the police checked his hands for gun-shot residue. The test proved negative." R. 31, at 7. But Pole utterly failed in the *habeas* brief to develop any legal argument that his lawyer's failure to put those results into evidence constituted ineffective assistance. These two mentions of the gunshot residue test were the only references Pole made in the district court before the court denied his petition.

After the district court ruled against him, Pole alluded to the gunshot residue test a third time, in his *pro se* motion for reconsideration. R. 41. There, for the first time in federal proceedings, he argued that if his attorney had presented the scientist who conducted the test and the results of the test, he would have been able to prove he was not the shooter. In the motion for reconsideration, Pole posited that the gunshot residue test would also have shown that his signed confession was untrue and coerced. He also argued that Ramon's affidavit would have explained why the gunshot residue tests were negative, namely because Pole was not touching the gun when it accidentally discharged. Pole attached the gunshot residue report to his motion for reconsideration before the district court. This third reference to the gunshot residue tests came too late, however, to preserve the issue for appeal. Arguments raised or developed for the first time in a motion to reconsider are generally

deemed forfeited. *Mungo v. Taylor*, 355 F.3d 969, 978 (7th Cir. 2004). In a fourth reference, Pole argued in his reply brief on the motion to reconsider that the gunshot residue evidence would have shown that it was impossible for him to have fired the fatal shot.[4] R. 56. Again, arguments raised in a motion to reconsider are generally deemed forfeited. *Mungo*, 355 F.3d at 978. In a fifth reference, Pole repeated the argument from his *pro se* reply brief in his *pro se* notice of appeal, again too late. R. 42. And sixth (and finally), in his *pro se* briefing on his request for a certificate of appealability, Pole stated, "it is further highlighted that Petitioner did not fire a gun that night because short [sic] after the shooting his hands and alleged glove were tested for gunshot residue. Both test [sic] yielded negative." R. 74, at 5. This reference also is too late to raise the issue, and in any case, in this final instance, Pole mentions the

---

[4] Based on our review of the record, Pole has never presented any evidence that the absence of gunshot residue demonstrates with any certainty that he was not holding the gun when the fatal shot was fired. He has presented no evidence, expert or otherwise, interpreting the results of the gunshot residue tests. We therefore cannot say whether the test was conclusive on the issue of whether he was holding the gun when it discharged, or whether, for example, he could have washed off any residue in the time between the crime and his arrest. On this record, we simply do not know the value of this evidence. Indeed, on direct appeal, the Illinois Court of Appeals commented, "The absence of gunshot residue does not mean that the person tested did not handle or fire the weapon." *People v. Pole*, Case No. 1-96-1030, at 11 (Ill. App. 1 Dist. Dec. 22, 1997).

gunshot residue test only in the context of bolstering the importance of Ramon Hamilton's affidavit and potential testimony.

Only the first two references came before the district court ruled on the petition for *habeas* relief. Neither of those references contained anything resembling an argument that counsel was ineffective for failing to present the gunshot residue evidence at trial. In the *habeas* petition itself, Pole listed only three bases for his claim of ineffective assistance: (1) the failure to call Pole as a witness at the motion to suppress; (2) the failure to adequately investigate the case which led to the failure to secure the recantations and other affidavits corroborating Pole's account of the incident; and (3) the failure of appellate counsel to raise ineffective assistance by trial counsel. Nowhere in his *habeas* petition or brief did he develop a legal argument that his lawyer was ineffective for failing to introduce the results of the gunshot residue test. All other references came too late in motions to reconsider and subsequent pleadings when Pole could have raised the arguments earlier. Pole offers no justification for failing to develop the argument earlier in the federal proceedings. The issue is thus forfeited. *Winsett*, 130 F.3d at 274 (appellate court may not consider a *habeas* argument that was not presented to the district court).

### 3.

The state agrees that two of Pole's ineffective assistance claims were fairly presented to and adjudicated on the

merits by the state appellate court, and that those claims were not procedurally defaulted. According to the state, Pole properly preserved claims that counsel was ineffective (1) for failing to call Pole as a witness at his suppression hearing; and (2) for failing to investigate Ramon Hamilton and Lontray. State's Brief at 24, 50. The state concedes that the district court erred in finding a "complete procedural default." We therefore will address those claims on the merits below. The state contends that Pole forfeited the other claims he now raises on appeal because he failed to raise those claims in the district court. In particular, the state maintains that Pole did not argue in the district court that counsel was ineffective when he failed to interview key prosecution witnesses (Andrea and Bonnie Hamilton and Karen Wills) and failed to interview or call other identified eyewitnesses (Thaddeus and Thomas, Jr.). Having reviewed Pole's pleadings in the state courts and district court, we find that Pole adequately raised both the legal and factual bases for the claims related to the prosecution witnesses. In both the state courts and the district court, he attached the affidavits that formed the basis of these claims. Pole did not, however, argue in his *habeas* brief in the district court that counsel was ineffective for failing to investigate Thaddeus and Thomas Jr., the putative additional eyewitnesses to the crime, and therefore that claim is forfeited because it is presented for the first time on appeal. *Winsett*, 130 F.3d at 274. In sum, we will address on the merits Pole's claims that trial counsel was ineffective in (1) failing to call Pole as a witness at the suppression hearing;

(2) failing to investigate Ramon Hamilton; and (3) failing to interview the prosecution witnesses (Andrea and Bonnie Hamilton and Karen Wills), who, in part, later recanted their testimony.

**B.**

As we noted above, in order to make out a claim for ineffective assistance, a petitioner must show both that his lawyer's performance fell below an objective standard of reasonableness as measured by prevailing professional norms, and also that the petitioner suffered prejudice as a result of counsel's errors. *Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521. When we are reviewing a *Strickland* claim through the lens of the AEDPA, in order to prevail, the petitioner must demonstrate that the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

**1.**

We turn first to trial counsel's failure to call Pole as a witness at the suppression hearing. Counsel failed to call any witnesses at the suppression hearing, instead relying on his cross-examination of prosecution witnesses to make his case. The state called two police officers

and the state's attorney, each of whom interviewed Pole in the hours following his arrest. They testified that Pole was advised of his rights and not mistreated in any manner, that he read and understood the confession written out by the state's attorney, and that he appeared capable of understanding what was happening. Pole's lawyer argued to the state trial court that, at the time of the interrogation, Pole was eighteen and had a limited education. This was the first time he had been interrogated, and he lacked experience with the criminal justice system. Pole's counsel also argued that he was held for a lengthy time before he confessed, and that under the totality of the circumstances, his statement was not voluntary.

In his affidavits, Pole claims that, had he been called to testify at the suppression hearing, he would have told the court that the officers chained him to the wall of the interrogation room. R. 13, at C51, C57 and C61. Two officers gave him a snack and a drink and asked him if he knew about the shooting at the gas station. When Pole told the officers that the shooting was accidental, one of the officers took back the snack and drink and called him a liar. The other officer took him to another room and handcuffed him to the wall again. Pole was tired and had difficulty getting into a position where he could sleep because he was handcuffed to the wall. On two or three occasions, when he started to fall asleep, officers came back into the room, woke him up, and asked more questions. According to his affidavits, at the time of his interrogation, Pole had been awake for twenty-four to thirty hours, and had been selling

narcotics, smoking marijuana, and drinking rum in the hours before his arrest. Pole would have testified that he was not in a "normal frame of mind," and that he told the officers he was tired and needed sleep. R. 13, at C59. Eventually, according to Pole, the state's attorney told him that, in order to save himself, he should sign a paper saying that Ramon was the shooter. Pole signed the paper without reading it in the hopes of "getting it over." R. 13, at C55.

We begin with the presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Thompson v. Battaglia*, 458 F.3d 614, 620 (7th Cir. 2006). To determine whether a confession is voluntary, the court looks at the characteristics of the defendant and the conduct of the interrogators to determine if the defendant's will was overcome by coercion. *Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) (whether a confession was voluntary depends on the totality of the circumstances surrounding that confession, including both the characteristics of the accused and the details of the interrogation that resulted in the confession). A confession is voluntary if, considering the totality of the circumstances, it is the product of a rational intellect and free will, and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004). *See also Johnson v. Pollard*, 559 F.3d 746, 753 (7th Cir. 2009) (a confession is involuntary when it was given in circumstances that were sufficient to overbear the confessor's free will).

Moreover, coercive police activity is a necessary predicate to finding that a confession is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986); *Gillaum*, 372 F.3d at 856. Courts may consider, among other things, the age, experience, education, background and intelligence of the accused, the length of the questioning, and other circumstances surrounding the interrogation when evaluating whether a confession was voluntarily given. *Johnson*, 559 F.3d at 755. *See also Gillaum*, 372 F.3d at 856-57 (same).

The basis of Pole's claim of coercion is that his interrogators deprived him of sleep and lied to him at a time when he was mentally impaired by his consumption of marijuana and rum in the hours leading up to his arrest.[5] He signed the papers, he contends, because he was told they implicated Ramon as the shooter. He did not tell the officers that he was under the influence of rum and marijuana but only that he was tired and needed to

---

[5] We note that Pole's affidavit generally denies he made any oral statements incriminating himself, and the alleged coercive activity surrounds only his signed statement. The police officers and assistant state's attorney testified (and the trial court found their testimony credible) that Pole's first oral confession came within a few hours of his arrival at the police station. Pole does not allege that the police officers lied to him during the earlier part of the evening, only that the assistant state's attorney misrepresented the contents of the signed statement much later. The signed statement was written at approximately 6:45 a.m. on September 28, 1994, nearly twelve hours after the murder.

sleep.[6] He also does not claim that the officers threatened him or physically abused him in any other way. Pole's lawyer did not call any witnesses, but instead relied on cross-examination of the state's witnesses to support the motion to suppress. The state trial court found that the state's witnesses were credible, that Pole had been read his rights and that there was no evidence supporting his allegations of coercion. As we noted above, the state appellate court, in post-conviction proceedings, found that counsel's performance at the suppression hearing was not deficient. Specifically, the state appellate court found that counsel's strategy of cross-examining the state's witnesses and arguing Pole's youth and inexperience to the trial court was adequate.

We recently had the occasion to consider whether relying solely on a cross-examination of the state's witnesses to prove coercion fell within the range of competent legal representation. *See Bynum v. Lemmon*, 560 F.3d 678 (7th Cir. 2009). Bynum told his lawyer that, during his interrogation, the police threatened him with violence when he asked for a lawyer, handcuffed him to a chair for nine hours, deprived him of food and water and refused to let him go to the bathroom, among other things. Bynum's lawyer moved to suppress his confession but did not ask Bynum to testify at the hearing. Instead, counsel questioned the officers who

---

[6] In Pole's signed confession, he claimed not to be under the influence of drugs or alcohol at the time of making his statement.

took Bynum's statement. The officers contradicted every part of Bynum's claim of coercion, and the trial court found the officers credible. Counsel later explained that he did not call Bynum to the stand because he did not think Bynum would hold up under cross-examination. We noted that Bynum's account of the interrogation was the only available evidence of coercion. We found that an expectation that the interrogating officers would admit on the stand that they used coercion to force Bynum's confession was more "television fantasy" than trial strategy. Any competent lawyer would have expected the interrogators to deny that they coerced a suspect. Without an admission to wrongdoing by the interrogators, Bynum was left with no evidence that his confession was coerced. Because a "motion to suppress allegedly involuntary confessions cannot succeed without at least some evidence that the confessions were coerced," and because counsel's reason for keeping Bynum off the stand was legally baseless, we concluded that counsel's actions fell well outside the range of competence demanded by attorneys in criminal cases. *Bynum*, 560 F.3d at 684. We held that the state court's conclusion to the contrary was an unreasonable application of the *Strickland* standard. *Bynum*, 560 F.3d at 685.

Pole's case presents a similar situation. Counsel had only Pole's testimony that, at the time of his interrogation, he was obviously under the influence of drugs and alcohol, he had been awake for twenty-four to thirty hours, and the officers chained him to the wall in a manner that made it difficult to sleep and then woke him up every time he tried to fall asleep, even though

he told the officers that he needed to sleep.[7] More-over, only Pole could testify that when he signed the confession, he did so because the interrogators told him the confession implicated Ramon as the shooter and not himself. We do not know why Pole's counsel declined to call him to the stand because there has been no hearing on Pole's claim of ineffective assistance and Pole has submitted no affidavit from his trial counsel. Perhaps Pole's lawyer wished to avoid the possibility that Pole would be impeached at trial with any testimony he gave at a suppression hearing. *See People v. Sturgis*, 317 N.E.2d 545, 548 (Ill. 1974) ("We therefore hold that the testimony of a defendant or documents voluntarily attested to by him in conjunction with his motion to suppress evidence may not be introduced by the State directly in its case in chief but may be used for purposes of impeachment should the defendant choose to testify at trial."). Pole's lawyer may also have been concerned that the trial court would enhance Pole's sentence for obstruction of justice if Pole testified and the court dis-believed him. In Bynum's case, we had the benefit of a fully developed record, including testimony from Bynum's lawyer explaining why he attempted to prove coercion using only the prosecution witnesses. We

---

[7] A defendant's mental state is not enough alone to render his confession involuntary for suppression purposes. *See Connelly*, 479 U.S. at 164-65. Although mental condition is relevant to a defendant's susceptibility to coercion, the police interrogator must have committed wrongful acts in order for a confession to be suppressed as the product of coercion.

found that counsel's performance was deficient because an attempt to prove coercion on the basis of the interrogators' testimony alone without a valid reason to do so was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *Bynum*, 560 F.3d at 685. Without knowing counsel's reasoning in this case, we will assume that counsel's performance was deficient and move on to the second part of the analysis.

Pole must still demonstrate, of course, that any error prejudiced him. *Strickland*, 466 U.S. at 693; *Bynum*, 560 F.3d at 685. To succeed on the prejudice prong of *Strickland*, Pole must demonstrate that, had he testified, there was both a reasonable probability that he would have prevailed on the motion to suppress and a reasonable probability that he would have been acquitted. *Strickland*, 466 U.S. at 694; *Bynum*, 560 F.3d at 684. *See also Thompson*, 458 F.3d at 620 (a *habeas* petitioner claiming that a lawyer's failure to make a motion to suppress was ineffective must prove that the motion would have been meritorious). Unlike *Bynum*, where the primary evidence against the defendant was the confession itself, we cannot assume that Pole would have been acquitted had the motion to suppress been granted; there was considerably more evidence against Pole than the signed confession. In addition to oral and written confessions to the police officers and state's attorney, Pole had confessed to Andrea Hamilton and Karen Wills, and was implicated by Ramon Hamilton as the shooter. Persons on the scene identified him as the individual who asked about three men in the van and who later drove by flashing gang signals. The police had also recovered

the murder weapon along with a glove bearing Pole's name. In Pole's own version of events on the night of the murder (which we glean from the affidavits he has filed with his *habeas* petition), Pole concedes he called his fellow gang members to the scene, that the group had gone back to the tire shop to confront a member of a competing gang, and that he was present when the fatal shot was fired during the struggle to set the safety on the gun. Indeed, the only salient points on which Pole's story differs from the state's version are (1) whether the shot was fired accidentally by his compatriots at a time when he was not touching the gun, or whether Pole fired the shot deliberately; and (2) whether Pole and his fellow gang members were there to beat a gang rival or to rob him. The difference between Pole's version and the state's version of the shooting would be the difference between first degree murder and involuntary manslaughter if Pole had not also been convicted of attempted armed robbery, another felony arising out of the same event. That is, if Bernard Jackson's death was the result of the attempted armed robbery, for the purposes of the Illinois felony murder statute, it would not matter whether Pole aimed deliberately or whether the gun accidentally discharged; in either case, Pole would be guilty of first degree murder. *See People v. Figueroa*, 886 N.E.2d 455, 463 (Ill. App. 1 Dist. 2008) (under the felony murder doctrine, a felon is responsible for the direct and foreseeable consequences of his actions, regardless of whether the defendant intended to kill the victim or whether the death was accidental); *People v. Pugh*, 634 N.E.2d 34, 35-36 (Ill. App. 5 Dist. 1994) (felons are

responsible for those deaths which occur during a felony and which are foreseeable consequences of their initial criminal acts; it is immaterial whether the killing was intentional or accidental or was committed by a confederate without the connivance of the defendant or even by a third party trying to prevent the commission of or resist the felony). Pole's confession implicated him in both the armed robbery and the murder, and so the suppression motion could have affected both convictions. Because Pole also alleges that the other evidence of his participation in the crime is suspect (in particular, the evidence from Andrea Hamilton, Karen Wills and Ramon Hamilton), we will defer the final analysis of whether the confession would have been suppressed or whether Pole would have been acquitted until we consider his other claims of ineffective assistance.

### 2.

As we have already noted, both the state appellate court and the district court misread Ramon Hamilton's affidavit. Each court assumed that Ramon was not present at the shooting and that his testimony therefore could not have influenced the outcome of the trial. In his affidavit and even in the state's version of the facts, Ramon was present at the shooting, and was the individual who brought the gun to the encounter. Indeed, Ramon was charged with and pled guilty to murder and attempted armed robbery, the same charges on which Pole was convicted at trial. In the course of pleading guilty, Ramon admitted to the prosecutor's proffered

factual basis for his plea. According to that proffer, after Ramon was arrested on the night of the murder, he received *Miranda* warnings and, with his mother present (because Ramon was fifteen years old at the time), gave a statement implicating himself and Pole. According to that statement, Pole came to Ramon the evening of the murder to ask for a gun so that Pole could go to the tire shop and rob the Gangster Disciples of their jewelry. Ramon provided Pole with a loaded handgun, and drove in a separate car when the Blackstones passed in front of the tire shop to verify that Gangster Disciples were present. After parking their cars near the tire shop, Pole asked Ramon to release the safety on the gun and Ramon obliged. They approached the shop and Pole fired one shot before the two fled the scene. After being told that Pole gave the gun to Ramon's sister, Ramon retrieved the gun and hid it until the police arrived and demanded the weapon. Ramon conceded all of this at his change of plea hearing.

In his affidavit, Ramon told a different story of the night of the murder. R. 13, at C63.[8] According to the affidavit, Ramon was at his home with Thomas Jr., Lontray, Rob and Thaddeus "smoking weed" when Pole

---

[8] As previously noted, this affidavit was signed in 1998, more than four years after the murder. Pole submitted Ramon's affidavit to the Illinois appellate court with his *pro se* petition for post-conviction relief in November 1998, and also submitted it in his federal *habeas* proceedings.

drove up.[9] R. 13, at C63, ¶3. Pole told the group that a rival gang member, Corey Lamb, was at the tire shop. Thaddeus suggested that the group proceed to the tire shop to beat Lamb for a past wrong. After Rob balked, Thaddeus suggested that the group drive past the tire shop to make sure that Pole was correct about the identity of the man he saw there. They drove past the shop, confirmed Pole's claim, and then parked in the alley behind the shop. As they walked toward the tire shop, Thaddeus asked if everyone had his back, and Ramon offered that he had a gun. Thaddeus then took the gun from Ramon and said he was going to hit Lamb with the gun. Ramon and Lontray told him to put the safety on or to take the clip out to prevent an accidental shooting. While Thaddeus was trying to put the safety on, Ramon and Lontray reached for the gun and it discharged toward the van at the tire shop. Everyone ran, and Ramon returned home and "fired up [his] blunt."[10] Thaddeus and Pole came to Ramon's house and Ramon asked where the gun was. When Pole told him it was in his car, Ramon told him to retrieve the weapon.

Pole left to get the gun, and Ramon proceeded to a "game room" with Lontray, where he played a few games and smoked more marijuana. When Ramon returned home, his sister Andrea gave him the gun and he hid it on the

---

[9] No last names have been offered by Pole or by any of his affiants for any of these individuals.

[10] According to www.urbandictionary.com, a blunt is a cigar that has been hollowed out and refilled with marijuana.

side of his house. When the police arrived and asked for the gun, Ramon (by his own account) "played crazy" and told the officers he did not know what they were talking about. After the officers starting "pulling and shaking" him, he turned over the gun. The officers then took Ramon, his sister and his mother to the police station for questioning. The police questioned Ramon with his mother present, telling him that Pole had named him as the shooter. When Ramon denied being the shooter, the officers told him that the only way for him to go home was to sign a statement implicating Pole as the shooter. Ramon refused to sign the statement until his mother directed him to do so. Contrary to the officer's promise, Ramon was not released, but was placed in custody at a juvenile facility. Ramon's lawyer later recommended that he accept a plea deal and testify against Pole. Ramon's mother told him to take the deal, and Ramon pled guilty. Ramon was never asked to testify against Pole. R. 13, at C63-66.

According to Pole, Ramon's testimony, as portrayed in his affidavit, would have exonerated him. Pole claims that his lawyer's failure to investigate Ramon and call him to the stand constituted ineffective assistance of counsel. Ramon, Pole contends, was an eyewitness whose testimony could have shown that Pole was not the shooter. Similarly, Lontray was an eyewitness whose testimony could have exonerated Pole of the charge of first degree murder. Because the district court and the state court misconstrued the affidavit, we will review this claim without the usual deference. We first consider whether counsel's failure to investigate Ramon and

Lontray was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Ramon had signed a confession on the same night that Pole implicated himself, and Ramon's confession substantially matched the statements given by his sister Andrea and by her friend Karen Wills. Ramon also pled guilty to the murder and conceded the state's version of the facts at his plea allocution. That version, of course, named Pole as the shooter.

Pole's argument on this point presumes first that his trial counsel did not investigate Ramon Hamilton or Lontray. The record, however, does not tell us whether counsel in fact had investigated these two eyewitnesses to the crime prior to the time of the trial.[11] Pole did not obtain an affidavit from his trial counsel, and neither the state courts nor the district court held a hearing at which the fact-finder could have discerned whether there was a factual basis for Pole's claim that counsel failed to investigate these witnesses. Moreover, Pole has submitted no affidavit from Lontray supporting his claim that Lontray's testimony would exonerate Pole. On appeal, Pole does not ask us to remand for a hearing but rather requests that we simply reverse the district court's order and remand with instructions to issue the writ. Given that it was Pole's burden to produce evidence on this point, and given that Pole has neither produced that evidence nor requested a hearing where he would

---

[11] Ramon's affidavit does not mention Pole's attorney. R. 13, at C63-C66.

have an opportunity to provide that evidence, we decline to assume the truth of assertions that lack record support.

Pole's argument also presumes that, had counsel investigated Ramon Hamilton, counsel would have been able to convince Ramon to recant his confession, withdraw his guilty plea (or at least recant his plea hearing allocution), and reverse his intention to cooperate with the state in Pole's prosecution. As for Lontray, Pole's argument presumes that counsel would have been able to locate the elusive Lontray (whose last name has yet to be provided), and would have been able to get Lontray to confess that it was he who was holding the gun and struggling with his cohorts when the weapon discharged. In other words, counsel would have had to persuade Lontray to confess to his part in the shooting death of Bernard Jackson. In the case of both Ramon and Lontray, nothing in the record supports the wild speculation that counsel would have been able to convince Ramon to admit to perjury and Lontray to testify to the version of the facts now promoted by Pole and Ramon. Nor may we ignore the bizarre nature of the story Pole now promotes through Ramon, that gang members who concede they were on their way to confront and beat a rival gang member, stopped to argue about how best to protect the target of their wrath from an accidental shooting.[12] Reasonably competent counsel had every reason

---

[12] In the affidavits filed with the *habeas* petition, both Ramon and Pole concede that they went to the tire shop to "beat Corey's

(continued...)

not to call Ramon to the stand. Ramon's guilty plea, his confession and his allocution all provided strong evidence against Pole. Ramon's earlier versions of events pointed to Pole as the instigator for the entire confrontation and as the ultimate trigger man. In light of the gaps in the record, Ramon's confession and guilty plea, and the utter lack of information regarding Lontray, we cannot say that counsel's possible failure to investigate or call these witnesses fell outside the wide range of profession-ally competent assistance. *Strickland*, 466 U.S. at 690.

### 3.

Pole's primary evidence that his lawyer failed to investi-gate Andrea and Bonnie Hamilton and Karen Wills comes in his third affidavit. R. 13, at C61. There he states that, after talking to Andrea and Karen before the trial, he asked his lawyer to investigate the two. His lawyer replied that a private investigator would cost about $250, a price Pole agreed to pay. According to the affidavit, Andrea told Pole before the trial that she and her mother signed statements implicating him only because the

---

[12] (...continued)

ass," in Ramon's words, and to "whip Corey's ass," in Pole's words. They also both conceded that after Ramon produced the gun, Thaddeus announced he was going to use the gun to pistol whip Corey, their gang rival. R. 13, at C51, ¶¶ 8, 14; R. 13, at C63, ¶¶ 5, 12. Only then did these unusually conscientious gang members begin to argue about how best to pistol whip Corey without actually shooting him.

police told them they could go home if they did so. Andrea offered that if Pole sent his lawyer to meet them, Andrea and her mother would sign affidavits explaining why they signed the original statements. Andrea later refused to talk further to Pole, telling him she was going to testify for the state. According to Pole, his lawyer also told him that if Andrea and Karen were willing to sign affidavits changing their original stories, they would likely testify "to the exact same thing at trial on the stand." R. 13, at C61, ¶ 4. Pole believed that Andrea was trying to protect her brother Ramon when she withdrew her support from Pole.

Pole has not provided any affidavit from Karen Wills, stating only in his own affidavit that he spoke to Wills in May 1995, and that Wills related to him that "she did not want to sign the paper but she just wanted to go home that night, especially since the police knew she had stolen some hair care products. She further related that she meant me no harm she just signed the paper that she thinks the State's Attorney had written up." R. 13, at C61, ¶¶ 1-2. Yet Pole has presented no evidence that Karen Wills ever recanted her statements from the night of the murder or her testimony at trial, both of which implicated Pole as the shooter. She states (through Pole) that she did not want to sign the statement and meant no harm to Pole but does not assert that she lied in her initial statements and testimony. Notably, neither the affiants (Pole, Bonnie and Andrea Hamilton) nor Karen Wills state that Pole's lawyer did *not* contact them or investigate their stories. Nor do any of them claim that

the statements they signed on the night of the murder were untrue.[13] Rather, they now assert that they signed the statements because they wanted to go home, or because they wanted to protect themselves or Ramon. Each testified at trial consistently with their original statements. Bonnie Hamilton's affidavit does not add much to the mix. She averred that the prosecutor told her the only way for her and her children to go home was for Ramon to sign a statement saying that Pole shot at someone and for Andrea to sign a statement saying that Pole gave her the gun. Again, Pole himself concedes (as does Ramon Hamilton) that Pole gave the gun to

---

[13] Andrea Hamilton comes closest to saying that her original statement was untrue. In her affidavit, she alleges that the prosecutor told her to testify that Pole brought a gun to her house and that Pole told her he shot somebody. The prosecutor told her that she had to choose between her brother and Pole and "It's only natural I would chose Ramon." She also averred that she now felt "responsible for my brother Ramon and Willie [Pole] being locked up for something that they had nothing to do with." R. 13, at C72-C73. That Pole and Ramon had "nothing to do with" the shooting is a characterization of events belied by the affidavits of Pole and Ramon. Each now concedes that they went to the tire shop with a gun to attack a rival gang member, an action that led to the shooting death of an innocent bystander. They also both stated in their affidavits that Ramon directed Pole to bring the gun to Ramon's house, and that Pole did so by giving the gun to Andrea with directions to bring it home for Ramon. Her assertion that the prosecutor manufactured her statement is curious in light of her brother's concessions.

Andrea after the shooting. Bonnie Hamilton does not aver that the prosecutor was asking Ramon to *falsely* claim that Pole shot at someone, only that the prosecutor asked Ramon to sign a statement to that effect. Bonnie Hamilton, like her daughter, now complains that Ramon is "locked up for a murder he did not commit," even though Ramon pled guilty to murder charges and agreed to the truth of the prosecutor's proffer at his plea allocution. R. 13, at C78-C80.

If in fact Pole's lawyer failed to investigate Andrea and Bonnie Hamilton and Karen Wills, we cannot say on this record that failure caused Pole any prejudice at trial. *See Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521. Andrea and Bonnie Hamilton have both conceded that, at the time of the arrests and trial, their primary concern was to protect Ramon Hamilton. Pole's counsel was able to show Andrea's bias on cross-examination at trial, getting her to concede that she loved Ramon and would not do anything to hurt him. Karen Wills has not recanted to this day, and testified at trial consistently with her original statement to the police on the night of the murder. Pole assumes that his lawyer could have convinced Andrea to testify in a manner contrary to her original statement and contrary to what she believed was in her brother Ramon's best interest. He also speculates that Karen Wills would have changed her testimony had she been approached by Pole's lawyer. Even if Pole's lawyer had managed either of these highly speculative and unlikely feats, Pole would also have to show a reasonable probability that he would have been acquitted if the jury had been presented with this additional evi-

dence. *Strickland*, 466 U.S. at 694; *Bynum*, 560 F.3d at 685; *Richardson*, 401 F.3d at 803. In light of the substantial other evidence against him, Pole has failed to make such a showing.

**4.**

Before addressing the possible prejudice of counsel's performance as a whole, we must address the district court's handling of Pole's *pro se* motion to reconsider. We previously held that the district court erroneously treated the timely motion to reconsider as an unauthorized attempt to litigate a successive collateral attack on his sentence. *See Pole v. Firkus*, Case Nos. 06-2768 & 06-3281, Order, at 2 (7th Cir. Jan. 18, 2007). We concluded that the court should have treated the filing as a timely motion for reconsideration and should have decided it on the merits. Fed. R. Civ. P. 59(e). In his motion to reconsider, Pole pointed out that both the state appellate court and the district court misread Ramon Hamilton's affidavit. Pole's observation was correct, and the district court should have declined to defer to the state court's findings on Ramon's affidavit. We have not deferred to the state court's findings regarding Ramon's affidavit, and instead have resolved Pole's claims using the assumption that Ramon would have testified that he was present at the shooting. Pole also noted for the first time in the motion to reconsider that the gunshot residue test results would have supported his motion to suppress his confession and would have corroborated Ramon's new account of the crime. As we

explained above, however, arguments made for the first time in a motion to reconsider come too late for the court's consideration. *Mungo,* 355 F.3d at 978. Although the district court should have decided Pole's motion to reconsider on the merits, we conclude that the error does not affect the outcome of the appeal.

## C.

Finally, we consider whether Pole was prejudiced by any deficiencies in his counsel's performance, an inquiry we make by considering counsel's performance as a whole. *Thompson*, 458 F.3d at 616 (counsel's performance must be addressed as a whole; it is overall deficient performance rather than a specific failing, that constitutes the ground of relief); *Peoples*, 403 F.3d at 848 (same). We assumed above that counsel's decision to rely entirely on the state's witnesses to establish that Pole's confession had been coerced constituted deficient performance. In *Bynum*, the defendant's confessions provided the primary evidence against him. *Bynum*, 560 F.3d at 685. Because the only other evidence supporting Bynum's conviction consisted of a voice identification by a thirteen-year-old boy who had heard the defendant speak on one other occasion, we reasoned that Bynum would have been acquitted had the two confessions been suppressed. In Pole's case, in addition to his signed confession, Pole sought to exclude oral statements he made to two police officers and an assistant state's attorney on the night of the murder. These statements were all consistent with statements Pole made that same evening to Andrea

Hamilton and Karen Wills, who also testified at trial. Pole was also identified by other persons present at the tire shop that evening as the person who had inquired about the gang affiliation of the other men at the shop, and as the person who later drove past the shop flashing gang symbols. His car was identified by witnesses, and the murder weapon was recovered from Ramon Hamilton's house, along with a glove marked with Pole's name. Unlike *Bynum*, there was considerable evidence of Pole's guilt beyond the allegedly coerced confessions to law enforcement officers and the prosecutor. We conclude that Pole has failed to demonstrate a reasonable probability that he would have been acquitted had the oral and written confessions been suppressed.

Although we earlier assumed that the failure to put Pole on the stand was outside the wide range of professionally competent assistance, we ultimately find that Pole has failed to demonstrate a reasonable probability that he would have prevailed at the suppression hearing if he had testified on his own behalf. As with *Bynum*, the court found the officers and assistant state's attorney testifying against Pole were credible. *Bynum*, 560 F.3d at 685. And as with *Bynum*, we defer to this conclusion because it was reached after a hearing on the merits and is supported by the record. *Id*. Had Pole testified at the suppression hearing, he would have had only his own uncorroborated testimony of coercion, with no physical evidence and no other witnesses. In his signed confession, Pole stated that he was treated well by the police officers and the assistant state's attorney, that he was given water and soda to drink, that he was allowed

bathroom breaks, that he was not promised anything in exchange for his statement and that he was not threatened in any way. He also stated that he was not under the influence of drugs or alcohol at the time he signed the confession. Weighed against his signed statement and the credible testimony of two police officers and an assistant state's attorney, Pole offers only his uncorroborated testimony that he was kept awake for approximately ten hours before he confessed. We conclude Pole has failed to demonstrate a reasonable probability that he would have prevailed at the suppression hearing if he had testified on his own behalf.

Viewing counsel's performance as a whole, we note first that Pole's lawyer was faced with a client who confessed to no fewer than five people within hours of the murder, including two acquaintances, two police officers and an assistant state's attorney. By his own admission, Pole instigated the entire incident and then personally tried to hide the murder weapon after the shooting. The gun was found with a glove marked with Pole's name. Although Pole claims not to have been touching the gun, he was the person who was in possession of the gun after the shooting. The basis for Pole's claim that the shooting was accidental is a highly suspect story: a group of drug-addled gang members who were on their way to beat a rival gang member stopped to argue about how to engage the safety on the gun so that they would not accidentally shoot their rival. And while trying to protect their target, they tussled over the gun and accidentally shot an innocent bystander.

Despite these facts, Pole's lawyer successfully argued for the court to instruct the jury on the lesser offense of involuntary manslaughter, and also successfully argued that there were sufficient mitigating factors to preclude imposition of the death penalty. Given the evidence against Pole, these were significant victories. There are certainly things that Pole's lawyer could have done differently and perhaps more effectively. That is not the standard, however, for *habeas* review under the AEDPA. "Habeas relief must not be granted unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Julian*, 495 F.3d at 492. *See also Jackson*, 348 F.3d at 662; 28 U.S.C. § 2254(d). The state court's adjudication of Pole's claim of ineffective assistance of counsel does not meet this standard. To demonstrate prejudice from counsel's deficient performance, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Any lawyer would have had difficulty persuading a jury to buy the story that Pole wanted to tell, given his multiple confessions and his farfetched explanation for the "accident." Pole has not shown a reasonable probability that the result of the proceeding

would have been different even if his lawyer had done everything Pole now argues he should have done. We therefore affirm the district court's denial of his petition for a writ of *habeas corpus*.

AFFIRMED.